William B. CALDWELL, III, and Ben Frank Billings, III, for Themselves and as Representatives of a Class of Similarly Situated Persons, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 02–1347L.

United States Court of Federal Claims.

June 30, 2003.

James P. Kelly, Atlanta, GA, for plaintiffs. Jeffrey O. Bramlett, John E. Floyd, Benja-

min E. Fox, and Sarah M. Shalf, Bondurant, Mixson & Elmore, LLP, Atlanta, GA, of counsel.

Kristine S. Tardiff, Concord, NH, with whom was Assistant Attorney General Thomas L. Sansonetti, Washington, DC, for defendant. Evelyn Kitay, Surface Transportation Board, of counsel.

## OPINION

MILLER, Judge.

This case is before the court after oral argument on defendant's motion to dismiss plaintiffs' complaint for lack of jurisdiction pursuant to RCFC 12(b)(1) and 12(h)(3). Plaintiffs seek, pursuant to the Tucker Act, 28 U.S.C. § 1491 (2002), just compensation for a taking effected pursuant to the National Trails System Act ("Trails Act"), 16 U.S.C. § 1247(d)(2002). Defendant invokes the bar of the applicable six-year statute of limitations, 28 U.S.C. § 2501 (2002).

## FACTS

The facts in this case are not disputed. William B. Caldwell, III, and Ben F. Billings, III ("plaintiffs"), have brought suit on behalf of themselves and all other similarly situated landowners in the state of Georgia. Plaintiffs allege that they are the fee simple owners of certain land in Georgia that historically was subject to a railroad easement held by Norfolk Southern Railway Company ("NSR"). They further allege that their ownership interests in this railroad corridor were taken from them by the actions of the Government under the National Trails System Act (the "Trails Act"), 16 U.S.C. § 1247(d)(2002). Defendant resists the claim on jurisdictional grounds, citing 28 U.S.C. § 2501 (2002).

### 1. Statutory and regulatory background

The statutory and regulatory framework surrounding the Trails Act is central to determining the timeliness of plaintiffs' claim. The Interstate Commerce Act of 1887, ch.

104, 24 Stat. 379, as amended and revised, and the Transportation Act of 1920, ch. 91, 41 Stat. 477–78, give the Interstate Commerce Commission (the "ICC")[1] exclusive and plenary authority over the construction, operation, and abandonment of virtually all of the nation's rail lines. *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 313, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981). *See generally RLTD Ry. Corp. v. Surface Transp. Bd.*, 166 F.3d 808, 810–11 (6th Cir. 1999) (discussing railroad regulation). A railroad cannot be relieved of its legal obligation to offer service on a particular rail line without first obtaining the express consent of the ICC. *See Colorado v. United States*, 271 U.S. 153, 165, 46 S.Ct. 452, 70 L.Ed. 878 (1926); *National Ass'n of Reversionary Prop. Owners v. Surface Transp. Bd.*, 158 F.3d 135, 137 (D.C.Cir.1998); *Glosemeyer v. United States*, 45 Fed.Cl. 771, 773 (2000). By imposing this regulatory restriction, "Congress sought to balance the railroad companies' need to dispose of trackage that was no longer profitable with the public's need for a working interstate track system." *RLTD*, 166 F.3d at 810.

In 1983 Congress passed the Trails Act, providing a railroad seeking to abandon or discontinue its use of a rail line with an option: railbanking. The term railbanking refers to the "preservation of railroad corridor for future rail use," while making the corridor available for other activities. *Nebraska Trails Council v. Surface Transp. Bd.*, 120 F.3d 901, 903 n. 1 (8th Cir.1997). The right-of-way is "banked" until such future time as railroad service is restored. *See Chevy Chase Land Co. v. United States*, 37 Fed.Cl. 545, 554 (1997), *aff'd*, 230 F.3d 1375, 1999 WL 1289099 (Fed.Cir.1999), *cert. denied*, 531 U.S. 957, 121 S.Ct. 380, 148 L.Ed.2d 293 (2000). Railbanking therefore represents an alternative to abandonment. *RLTD*, 166 F.3d at 811. "Congress determined that interim trail use was to be treated like discontinuance rather than as an abandonment." *Grantwood Vill. v. Missouri Pac. R.R. Co.*, 95 F.3d 654, 659 (8th Cir.

---

**1.** The ICC was abolished effective January 1, 1996; the Surface Transportation Board assumed authority to regulate under the Trails Act. *See* ICC Termination Act of 1995, Pub.L. No.

104–88, 109 Stat. 803 (1995). For the purposes of this opinion, the court refers to the ICC as the relevant authority, as the origins of the dispute pre-date the ICC's abolition.

1996), *cert. denied,* 519 U.S. 1149, 117 S.Ct. 1082, 137 L.Ed.2d 216 (1997). Thus, the Trails Act operates "to preserve for possible future railroad use rights-of-way not currently in service and to allow interim use of the land as recreational trails." *Preseault v. ICC,* 494 U.S. 1, 6, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990).

For a railroad corridor or right-of-way to be railbanked, the railroad first must engage in the ICC's regulatory abandonment process by filing either an abandonment application under 49 U.S.C. § 10903 (2002), or by seeking an exemption under 49 U.S.C. § 10502 (2002). Once an entity has filed an abandonment application or request for an exemption with respect to a given railroad, a party interested in acquiring or using the right-of-way for railbanking and interim trail use may request the issuance of a certificate of interim trail use ("CITU") (in abandonment application proceedings) or a notice of interim trail use ("NITU") (in abandonment exemption proceedings, as in the case at bar). 49 C.F.R. § 1152.29(a), (b)(1)(ii) & (d)(1) (2002).

The ICC's regulations require that a qualified party interested in "acquiring or using" a right-of-way to file a request or petition that includes: 1) a map of the right-of-way, or portion thereof, that is proposed to be acquired or used; 2) a statement of willingness to assume responsibility for the right-of-way, including management responsibility, legal liability, and payment of applicable taxes; and 3) an acknowledgment that interim trail use of the right-of-way is subject to "possible future reconstruction and reactivation of the right-of-way for rail service." § 1152.29(a)(1)-(3).

The ICC, having received the required documentation, determines whether to grant the request by applying a "rebuttable presumption of fitness" to the potential trail sponsor. *Citizens Against Rails-to-Trails v. Surface Transp. Bd.,* 267 F.3d 1144, 1150 (D.C.Cir.2001). When a complete request for the issuance of a NITU is received, and the railroad indicates that it is willing to negotiate a Trail Use Agreement, the ICC issues a NITU. 49 C.F.R. § 1152.29(b)(1); *Goos v. ICC,* 911 F.2d 1283, 1295 (8th Cir. 1990); *Citizens Against Rails–to–Trails,* 267

F.3d at 1151–52. The NITU stays the effective date of the abandonment authority for 180 days in order to allow the railroad and the authorized trail group to negotiate a railbanking and interim Trail Use Agreement. § 1152.29(d)(1).

If the parties do not reach a Trail Use Agreement during the initial negotiating period allowed by the NITU, and the ICC does not extend the negotiating period, the NITU authorizes the railroad to exercise its option to abandon the line without further action by the ICC. *Reversionary Prop. Owners,* 158 F.3d at 139. If an agreement is reached, the NITU automatically authorizes the interim trail use. *Id.* If the ICC takes no further action, the trail sponsor then may assume management of the right-of-way, subject only to the right of a railroad to reassert control of the property for restoration of rail service. *Goos,* 911 F.2d at 1295; § 1152.29(d)(2).

#### 2. *Factual background*

The railroad corridor at issue in this case is located in Columbus, Georgia (the "City of Columbus" or the "City"). It is locally known as the Warm Springs Rail Line and spans approximately 10.5 miles. The corridor originally was part of a 97–mile rail line from Columbus to McDonough, Georgia. The rail line was opened on December 1, 1887, and by 1990 it was owned and operated by NSR.

In 1992 the City of Columbus publicly introduced its "Columbus Alternative Transportation System," or "CATS" plan, which included a recommendation to construct pedestrian walkways and bikeways on existing railroad corridors. The CATS plan stated that one of the key components of the system was to obtain the Warm Springs Rail Line from NSR.

On May 5, 1994, NSR published a notice of intent to file a notice of exemption under 49 C.F.R. § 1152.50, which governs exempt abandonments, seeking permission from the ICC to abandon a 7.4–mile segment of rail line between milepost 90.0 in Meyer, Georgia, and milepost 97.4 in Columbus, Georgia. On July 5, 1994, NSR filed with the ICC its notice of exemption under section 1152.50 to

abandon the 7.4 miles of rail line. On July 26, 1994, the ICC issued an order allowing the exemption, effective August 25, 1994, conditioning it on certain events.

By letter dated August 11, 1994, NSR notified the ICC that it was "willing to negotiate for a trail use agreement with the City of Columbus, GA for the subject line" and that it consented to the issuance of a NITU. By letter dated August 12, 1994, the City of Columbus requested the issuance of a NITU and submitted its statement of willingness to assume financial responsibility for the rail corridor. The NSR reconfirmed in a letter dated August 17, 1994, that it agreed to negotiate with the City for railbanking and interim trail use.

The ICC issued a NITU for the rail corridor effective August 31, 1994. The ICC afforded the parties 180 days in which to negotiate a railbanking agreement, stating: "If an agreement for interim trail use/rail banking is reached by the 180th day after service of this decision and notice, interim trail use may be implemented. If no agreement is reached by the 180th day, [NSR] may fully abandon the line." On February 23, 1995, during the 180–day negotiating period, the City and NSR jointly requested that the NITU be expanded to cover an additional 3.2–mile segment of the same corridor.[2] The ICC subsequently issued a decision dated May 25, 1995 (effective June 2, 1995), consolidating the proceedings involving the 3.2–mile segment with those involving the 7.4–mile segment. This decision also extended the NITU negotiating period to August 26, 1995.

On August 17, 1995, just prior to the expiration of the NITU negotiating period, NSR entered into a purchase and sale agreement with the Trust for Public Land, the entity selected by the City to negotiate the acquisition of the rail corridor from NSR. This agreement was amended on April 18, 1996, and July 1, 1996. On April 30, 1996, the City Council approved the acquisition of the rail corridor. The Columbus City Council, at its October 24, 1995 meeting, authorized and directed the completion of title and environmental examinations of the corridor. The

Trust for Public Land assigned its rights under the agreement to the City on July 2, 1996. NSR executed a quitclaim deed to the City on October 9, 1996. The deed was recorded on October 11, 1996.

By motion filed July 5, 1996, the City notified the ICC that "[a] railbanking agreement [the 'Trial Use Agreement'] has been reached by the parties." However, the City also requested an extension of the NITU "in order to ensure that the railbanking period extends through the time of the actual transfer of the corridor to the interim trail manager, which is anticipated to occur on or before November 1, 1996, and to cover any gaps that may have inadvertently occurred in the railbanking negotiating period." NSR consented to the City's motion, which was granted by the Surface Transportation Board on August 6, 1996.

On October 7, 2002, plaintiffs filed a complaint alleging a taking effected by the Trails Act. Plaintiffs brought their action as the representatives of a class consisting of all persons who, in October and November 1996, owned an interest in the land burdened by the railway easement, which was subject to the City's Trail Use Agreement.

## DISCUSSION

### 1. *Jurisdiction*

The Fifth Amendment to the U.S. Constitution ensures that the United States does not take private property for public use without just compensation. U.S. Const. amend. V. When the Government does not provide compensation through eminent domain proceedings, the Tucker Act, 28 U.S.C. § 1491, operates to enforce a landowner's compensatory right. *Preseault v. ICC*, 494 U.S. at 11–12, 110 S.Ct. 914. Thus, plaintiffs' claim lies within the jurisdiction of the Court of Federal Claims under the Tucker Act.

An action in the Court of Federal Claims must be filed within six years of the claim's accrual. The timeliness of plaintiffs' claim therefore is governed by the statute of limitations set forth in 28 U.S.C. § 2501, which

---

**2.** The original 7.4–mile segment extended from milepost 97.4 to milepost 90.0. The additional 3.2–mile segment extended from milepost 90.0 to milepost 86.8.

provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." The statute of limitations is a jurisdictional requirement "attached by Congress as a condition of the government's waiver of sovereign immunity, [and therefore] must be strictly construed." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1576–77 (Fed.Cir. 1988).

Plaintiffs' claim will be time barred absent a showing that it first accrued within six years of the date on which plaintiffs' complaint was filed. Under this threshold analysis, a claim first accrues when "all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." *Hopland Band,* 855 F.2d at 1577.

### 2. *Standard of review*

The determination of whether this court has subject matter jurisdiction to hear plaintiffs' claim is a question of law. *Toxgon Corp. v. BNFL, Inc.,* 312 F.3d 1379, 1381 (Fed.Cir.2002); *Maher v. United States,* 314 F.3d 600, 603 (Fed.Cir.2002). A Rule 12(b)(1) motion to dismiss challenges a court's subject matter jurisdiction over a claim based on plaintiff's jurisdictional allegations. Because "the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction[,]" the court, in establishing the jurisdictional facts, "is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings ...." *Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1583–84 (Fed.Cir.1993), *cert. denied,* 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994); *see also Indium Corp. of America v. Semi–Alloys, Inc.,* 781 F.2d 879, 884 (Fed.Cir.1985), *cert. denied* 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986). Plaintiff in all such instances bears the burden of establishing jurisdiction by a preponderance of the evidence. *Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988).

### 3. *Claim accrual*

The issue in this case requires the court to determine when the Government's action over the rail corridor had permanent legal effect, thereby resulting in the Government's liability for the taking being made "definite" or "fixed." In the Trail Act scenario, the Government's liability is set when plaintiffs' property had been definitely converted to public use and the plaintiffs were able to bring a claim under the Tucker Act.

Plaintiffs argue that their claim accrued when the deed to the land in question passed from NSR to the City. Defendant offers two key events for determining when plaintiffs' claim accrued. The first—and defendant's preferred reference point—was the date on which the ICC issued its initial NITU for each segment of the subject rail corridor. The second alternative date occurred when the parties signed the Trail Use Agreement. The court addresses each argument, in turn.

### 1) *Passage of the deed*

It is plaintiffs' position that the permanence required by takings case law is achieved only with the delivery of the deed from the railroad to the trail group. They contend that a Trail Use Agreement triggers the statute of limitations when the agreement itself transfers lease interest or financial responsibility for the land, as required by the Trails Act. However, plaintiffs argue that where, as here, the transfer of all interests cannot occur until the delivery of a quitclaim deed, an earlier purchase and sale agreement does not itself trigger the running of the statute of limitations. Therefore, the purchase and sale agreement does not activate the running of the statute of limitations.

Plaintiffs point out that the Trails Act provides that the interim trail manager must 1) "assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way," 16 U.S.C. § 1247(d); and 2) agree that the transfer of trail use is "subject to possible future reconstruction and reactivation of the right-of-way for rail service," 49 C.F.R. § 1152.29(a)(3). According to plaintiffs, an

inchoate purchase and sale agreement, standing alone, does not satisfy these requirements, but a consummated transfer of property does.

Two major problems inhere in plaintiffs' reasoning. First, it is not stated why plaintiffs focus on the significance of the purchase and sale agreement, as opposed to the Trail Use Agreement. The only relevant case law focuses on the latter.[3] Plaintiffs present no case decided under the Trails Act suggesting that the relevant inquiry should be directed to the purchase and sale agreement, rather than the Trail Use Agreement. After all, it is the Trail Use Agreement that ends the NITU negotiation period. Second, plaintiffs do not make clear why the trail manager's assumption of duties should trigger a taking. Plaintiffs have presented no evidence suggesting that meeting the trail manager requirements constitutes a taking.

Plaintiffs further contend that takings under the Trails Act are analogous to condemnation proceedings. A taking in condemnation proceedings does not occur until either 1) the Government takes physical possession of the land without the authority of a court order, or 2) legal title passes to the Government pursuant to condemnation proceedings. *United States v. Dow*, 357 U.S. 17, 21, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958). In condemnation proceedings the announcement of a condemnation does not effect a taking; only the actual passage of title to the land does so. *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 14–15, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984).

In *Kirby* the Supreme Court did not find a taking "prior to the payment of the condemnation award in this case, an interference with petitioner's property interests severe enough to give rise to a taking under [this] theory. Until title passed to the United States, petitioner was free to make whatever use it pleased of its property." 467 U.S. at 14–15, 104 S.Ct. 2187. Even in the context of a condemnation proceeding, however, the Supreme Court scrutinized first the severity of interference with plaintiff's property rights. Only then did the Court hold that the level of

severity was met with the transfer of the deed. As an administrative matter, a condemnation announcement may threaten a landowner's rights to a lesser extent than the issuance of a NITU and the execution of a Trail Use Agreement. That difference could account for the Supreme Court's treating the condemnation announcement as constituting something less than a taking. The Court's holding in *Kirby* focuses less on the title to the land and more on the Government's interference with plaintiff's rights, and, to that extent, the case is instructive. It does not go so far, however, as to mandate that a taking in contexts other than condemnation proceedings can occur only with the passing of title.

Significantly, the Trails Act and its implementing regulations do not require a railroad to sell or transfer its ownership interest in the railroad corridor in order for that corridor to be railbanked and used for interim trail use. On the contrary, the statute expressly provides that interim trail use may occur by "donation, transfer, lease, sale, or otherwise." 16 U.S.C. § 1247(d). The applicable regulations also contemplate that a qualified trail group either can acquire or merely use the corridor for interim trail use or railbanking. 49 C.F.R. § 1152.29(a); *see also Chicago & N.W. Transp. Co.—Abandonment Exemption—Guthrie and Dallas Counties, IA*, No. AB–1 (Sub–No. 192X), 1987 WL 98423, at *4 (I.C.C. May 7, 1987) (trail use can occur under Trails Act "whether the involved railroad transfers or retains its interest in the right-of-way"); *Union Pac. R.R. Co.—Abandonment Exemption—In Saunders and Butler Counties, NE*, No. AB–33 (Sub–No. 81X), 1994 WL 562032, at *3 (I.C.C. Sept. 28, 1994) ("Neither the Trails Act nor our regulations require a potential trail user to hold title ownership in the trail; a potential trail user must only file a statement indicating its willingness to assume financial responsibility. *The statement of financial responsibility imposes a legal obligation upon the trail user even if the user does not hold legal title.*" (emphasis added)). It would not make sense for a

---

3. The two cases, *Smith v. United States*, No. 97–581L (Fed.Cl. Sept. 29, 1999), and *Illig v. United States*, No. 98–934L (Fed.Cl. Nov. 12, 1999), are discussed at length *infra* § 3(3).

claim accrual date to be triggered by the execution of a deed from the railroad to the trail group when neither the Trails Act nor its implementing regulations require a deed be transferred before the trail group may use the right-of-way.

During oral argument plaintiffs argued that *Chevy Chase,* 37 Fed.Cl. 545, supports their contention that the statute of limitations for a takings claim under the Trails Act begins to run upon the delivery of the deed. Plaintiffs in *Chevy Chase,* a land company and a country club, sued the United States alleging a taking after Montgomery County, Maryland, purchased a rail corridor pursuant to the Trails Act. The land company asserted that it owned the right-of-way strip and that the railroad's postponing of its abandonment obstructed the land company's full fee simple property interest in the strip. The country club argued that it used a portion of the right-of-way as part of its golf course. It also argued that it had easements to other parts of the right-of-way protecting the use of its land as a golf course.

While the *Chevy Chase* court's analysis regarding the CITU issuance and Trail Use Agreement was general and seems to apply to both plaintiffs in the case, the court's conclusion distinguishes between the two plaintiffs. The court's analysis regarding the land company focused on the CITU issuance and the Trail Use Agreement. The court's discussion of the country club's claim focused on the purchase date of the land in question. The court explained:

> The Club's complaint, filed on January 22, 1993, is also timely. The actual taking alleged by the Club is somewhat different from that alleged by [the land company]. The Club objects to an excess use of the right-of-way by Montgomery County. It asserts that implementation of the proposed plan will interfere with its ability to utilize its golf course—portions of which are located within, and the majority of which is located adjacent to—the right-of-way. As such, the Club's alleged taking

claim did not accrue until Montgomery County purchased the right-of-way in 1988. *Id.* at 564. The accompanying footnote reads:

> Further, whether Montgomery County merely has an easement—or if Montgomery County bought a fee simple—does not matter with regard to the Club's claims, because the Club asserts that its property interests within the right-of-way as well as its adjacent property will be affected by this purchase and accompanying intended use in either case.

*Id.* at 564 n. 17. *Chevy Chase* suggests that the claim accrual analysis differs depending on whether the interim trail use effects a taking of plaintiff's interest in the corridor lands, as opposed to merely affecting plaintiff's ability to use its existing lands. Because the case at bar deals with the former situation, the court does not reach the question of whether such a distinction bears on the date of claim accrual. Suffice it to say that *Chevy Chase* does not endorse a blanket rule triggering the statute of limitations as of the date of purchase. Indeed, the distinction between the land company and the country club supports defendant's argument that, where plaintiff alleges a taking of its land, not merely the use of its land, the Trail Use Agreement governs the claim accrual.

Plaintiffs have not argued convincingly that the court should focus on the purchase and sale agreement, rather than the administrative consummation of the taking, which culminates with the Trail Use Agreement.[4] Plaintiffs have not carried their burden of proof to establish that this court has jurisdiction over its claim based on the date of the purchase and sale agreement.

### 2) *Issuance of the NITU*

Defendant first argues that the correct claim accrual date is the date on which the ICC issued the NITU's for each rail segment: August 31, 1994 for the 7.4–mile segment; and June 2, 1995, for the 3.2–mile segment. Federal Circuit decisions involving

---

4. For this reason the court does not deem necessary a discussion of plaintiffs' alternative accrual dates, including the date on which the deed was recorded, the date on which the City authorized its mayor to execute agreements with NSR and the Trust for Public Lands, or the date on which the City filed a "Notification of Railbanking/Interim Trail Use Agreement."

Trails Act cases have not addressed directly the question of claim accrual. In *Preseault v. United States*, 100 F.3d 1525 (Fed.Cir. 1996) (*en banc*), the court ruled on whether a conversion of a rail corridor, authorized by the ICC, constituted a taking under the Fifth Amendment. The State of Vermont Agency of Transportation, joined by Vermont Railway, entered into a lease with the City of Burlington, dated June 18, 1985, whereby the former two entities leased a rail corridor to the latter for use as a bicycle and pedestrian path. The ICC issued a NITU the following year, on February 5, 1986. *See Preseault v. United States*, 24 Cl.Ct. 818, 822–23 (1992), *rev'd and remanded*, 100 F.3d 1525. Plaintiffs filed their takings claims on December 26, 1990, in the Court of Federal Claims, rendering their complaint timely under any application of the statute of limitations.

A plurality of the Federal Circuit agreed that "[u]ntil the ICC makes the administrative decision to convert an unused right-of-way to a trail, rather than simply permit abandonment, and finds an appropriate public agency to operate the trail, a landowner's suit for a taking would run afoul of established requirements of exhaustion of administrative remedies." 100 F.3d at 1538. Defendant argues that this language in *Preseault* requires that the court look to the issuance of the NITU as the required administrative action on which to predicate the commencement of the limitations period.

Defendant's argument suffers from two infirmities. First, defendant disregards the second clause in the sentence quoted from *Preseault*, requiring the ICC to select an appropriate public agency to operate the trail. This requirement is met only after the parties successfully negotiate a Trail Use Agreement. If the parties reach an agreement within the 180–day negotiating period, the interim trail use is authorized by the NITU; if no agreement is reached, abandonment is authorized automatically. Thus, the signing of the Trail Use Agreement satisfies the administrative action requirement described in *Preseault*.

Second, *Preseault* also placed great weight on the fact that plaintiffs in that case could not have brought suit before the taking had

been finalized. *See* 100 F.3d at 1538. If plaintiffs in *Preseault* had initiated a suit after the issuance of the NITU, but before the ICC had found an appropriate public agency to operate the trail, their claims would have been subject to a ripeness challenge. *Id.* Plaintiffs in the case at bar argue that, just as the Government's liability could not have been fixed at the time of the NITU's issuance, the statute of limitations also could not have been triggered at that time. Plaintiffs conclude that the ripeness challenge would preclude the statute's running following issuance of the NITU and the authorized party's taking title to the land.

Although the court reads the Federal Circuit's *Preseault* opinion to hold that the tolling of a statute of limitations could not begin before the ICC's issuance of the NITU, the appeals court did not go so far as to suggest that the NITU issuance in fact initiates the running of the statute. This court agrees with plaintiffs that it is axiomatic that, if plaintiffs' claim would be open to a ripeness challenge even after the issuance of the NITU, the statute of limitations could not run concurrently to diminish their rights.

Defendant argues that another Federal Circuit case, *Bass Enterprises Production Co. v. United States*, 133 F.3d 893 (Fed.Cir. 1998), supports its proposition that the statute is triggered at NITU issuance. Plaintiffs in that case alleged a taking of their leasehold-derived right to drill for oil and gas on certain federal lands after the Bureau of Land Management (the "BLM") denied their application for a permit to drill. The denial was temporary, pending a determination as to whether plaintiffs' leases must be condemned to protect the integrity of an underground nuclear waste repository under construction in the area of the leases. Although the trial court found that the BLM's permit denial constituted a permanent taking of plaintiffs' property, the Federal Circuit reversed, stating:

> Congress has expressly established a mechanism for condemning the leases at issue if deemed necessary to ensure the integrity of the [nuclear waste] facility. Such events are statutorily mandated to occur. Thus, in the interim, the denial of

the permits is at best a temporary taking. The statutorily mandated end to the regulatory process will result in a decision whether or not to condemn the leases. Although the precise date is unknown, it is clear that such a decision is required to be made. Thus, we conclude that the denial of the drilling permits at this time does not constitute a permanent taking.

133 F.3d at 895–96. The case was then remanded for a determination of whether the BLM's denial of a permit constituted a temporary taking. Defendant argues that the *Bass* plaintiffs' takings claims all related back to a single government action—the BLM's denial of a permit. By analogy, defendant contends that plaintiffs in the case at bar were in the same situation when the ICC issued the NITU: The fate of their land rights was unknown, but, at least temporarily, their rights were suspended.

While defendant's argument has intellectual appeal, it ultimately cannot surmount the precedent enunciated in *Preseault.* The Federal Circuit in *Preseault* did not look at the last government action, as defendant urges, but, rather, focused on the end of the administrative process, which the Government set into action with the NITU issuance, but which concluded with the execution of the Trail Use Agreement. *Preseault's* dependence on administrative finality in the context of the Trails Act prevents the court from relying on the loose analogy that defendant draws from *Bass.*

Defendant argues that *Chevy Chase,* 37 Fed.Cl. 545, also supports its contention that the statute began to run upon the issuance of the NITU. Defendant proffers the decision as finding that the administrative approval occurred with the issuance of the CITU and that plaintiff land company's claims therefore were timely. The court wrote:

> A taking cannot occur under 16 U.S.C. § 1247(d) until either (1) a railroad effects an abandonment of a railroad easement under state law but the reversion to the

fee owner is obstructed by way of federal statute, and/or (2) an approval of a plan for a hiker/biker trail which would burden a right-of-way with an additional servitude. *See, e.g., Preseault,* 100 F.3d at 1538–39. Only at either of these two points would the implementation of the Trails Act actually cause a taking of property of an underlying fee owner. *Id. . . .*

> However, the statute of limitations does not start to run until there has been an administrative determination [approving trail use] and assignment to a hiker/biker trail.

*Id.* at 563

*Chevy Chase* leaves open the question of whether the date of the NITU issuance, as opposed to the date of the Trail Use Agreement, marks the accrual of a plaintiff's claim. In the above passage, the court suggests that either date is possible; it uses the terms "either" and "and/or," but then links the conditions with an "and" in the final sentence.[5]

This court interprets the last sentence to mean that the existence of an administrative approval is a necessary, but not sufficient, factor required to trigger a takings claim. The last phrase indicates that the administrative action must be supplemented by an assignment to a hiker/biker trail before the statute of limitations can run, which essentially engrafts a condition on the second event. Thus, *Chevy Chase* specifies abandonment or an administrative determination, coupled with assignment to a hiker/biker trail. *Chevy Chase* does not support defendant's argument that the issuance of a NITU is sufficient to trigger the running of the statute of limitations for the purposes of 28 U.S.C. § 2501.

### 3) *Trail Use Agreement*

The Court of Federal Claims, in two un-

---

**5.** It is worth noting that another decision from the Court of Federal Claims interprets *Chevy Chase* to leave open the question of when the statute of limitations began to run. *See Smith v. United States,* No. 97–581L, slip op. at 4 (Fed.Cl. Sept. 29, 1999) *("Chevy Chase* leaves open the question of whether the date of the issuance of the CITU/NITU, as opposed to the date of the subsequent Trail Use Agreement, appropriately marks the accrual of a taking claim of this nature.")

published decisions,[6] has selected the execution date of the Trail Use Agreement as the date triggering the statute of limitations under 28 U.S.C. § 2501. In *Smith v. United States*, No. 97–581L (Fed.Cl. Sept. 29, 1999), the ICC issued a NITU in August 1989. The railroad and the qualified trail group entered into a Trail Use Agreement approximately five months after the ICC issued the NITU. Although plaintiff's claim would have been untimely under either measure—either from the NITU issuance or the Trail Use Agreement execution—the court held that the statute of limitations began to run when the parties signed the Trail Use Agreement. The court reasoned that prior to the Agreement, "it is uncertain whether the CITU/ NITU will take effect, and thus the reversionary right might still vest in the underlying owner." Slip op. at 4. The court went on to hold:

> It is not until the use of the easement, and the resulting burden on the underlying land owner, is fixed by way of a trail use agreement that the rights of the land owner are effected [sic] in a manner that gives rise to a permanent taking claim under the Fifth Amendment and the Tucker Act. *See Preseault*, 100 F.3d at 1537[–38] ("Until the ICC makes the administrative decision to convert an unused right-of-way to a trail, rather than simply permit abandonment, and finds an appropriate public agency to operate the trail, a landowner's suit for a taking would run afoul of established requirements for exhaustion of administrative remedies"). Accordingly, as plaintiffs' suit here was filed more than six years after … the date of the formal agreement, it is untimely and must be dismissed.

*Id.*

Defendant dismisses *Smith* as erroneously decided because the NITU is effective when issued to delay the vesting of any reversionary interests in the underlying owner of the railroad corridor land. However, the NITU takes effect only if the right-of-way meets the criteria for abandonment and negotiation of trail use occurs. Authorization to abandon the rail line becomes effective only when the

180–day negotiation period expires. The court's inquiry thus should focus on when the taking becomes permanent; as *Smith* reinforces, the mere issuance of a NITU does not represent the permanent taking of land rights by the Government. This court therefore agrees with the *Smith* court analysis that a permanent taking occurs when the parties successfully negotiate a Trail Use Agreement.

Plaintiffs respond that *Smith* does not address the question presented in the case at bar. Although *Smith* decided that, as between the NITU issuance and the Trail Use Agreement, the latter begins the statute of limitations, *Smith* did not involve a transfer of a property interest—only a transfer of possessory interest and financial responsibility. The transfer of responsibility occurred pursuant to the Trail Use Agreement, and the court did not consider whether the date of execution of a deed transferring property interest might be the point of taking. Plaintiffs therefore label *Smith* as factually distinguishable.

The court appreciates the difference between the facts in *Smith* and the facts in the case at bar, but the distinction that plaintiffs highlight is not material. As in *Preseault*, the analysis in *Smith* focuses on the severity of the interference with the landowner's rights to determine when the taking is fixed. Neither *Preseault* nor *Smith* makes its holding contingent on the nature of the proprietary interest. The courts' analysis in these cases focuses on the point at which the taking is fixed in the administrative process. Both cases determine that this point occurs when the Trail Use Agreement is finalized.

The Court of Federal Claims, in another unpublished opinion, *Illig v. United States*, No. 98–934L (Fed.Cl. Nov. 12, 1999), again focused on the permanence of the taking to resolve the question of when a statute of limitations begins to run for the purposes of 28 U.S.C. § 2501. In *Illig* the ICC issued a NITU on March 27, 1992. The parties signed the relevant Trail Use Agreement on December 30, 1992. Plaintiff filed its takings claims on December 28, 1998, rendering

---

6. The parties rely on them, so the court follows suit.

them untimely if measured from the NITU date, but timely if measured from the date of the agreement. Finding that plaintiff's claims accrued on the later date and therefore were not barred, the court reasoned that, had the railroad and trail group "failed to effect the conversion of the railway to a trail, the NITU would be rightly seen as having had no permanent legal effect on the property rights of the plaintiff. Prior to December 30, 1992, the effect of the NITU was inchoate; it merely threatened to permanently impinge plaintiff's property rights." *See* slip op. at 3.

Plaintiffs find *Illig* inapposite because the Trail Use Agreement was signed on the same date the deed was executed. However, plaintiffs' argument cannot overcome the established case law discussed above. The mere coincidence that the *Illig* Trail Use Agreement was signed on the same date that the deed passed does not displace the reasoning that the court enunciated in reaching its conclusion in the case.

The Federal Circuit, in *Creppel v. United States,* 41 F.3d 627 (Fed.Cir.1994), addressed the question of claim accrual in the context of an EPA procedure that allegedly effected a taking. Plaintiff landowners brought takings claims after the Army Corps of Engineers engaged in a flood control project. Phase I of the project began in 1964 and finished in 1973. Phase II commenced in 1974, but was halted that year while the Corps determined if the project complied with the Clean Water Act. In 1976 the Army issued the so-called Wilson Order that eliminated plaintiffs' expectation of land reclamation pursuant to the project. The EPA concurred with this result. Plaintiffs successfully overturned the order in court. In 1984 the EPA began proceedings to determine whether to stop the project by denying it a permit. The EPA issued a Final Determination on October 16, 1985, permanently blocking the project. Plaintiffs brought four consolidated takings claims in the Court of Federal Claims in 1991. Defendant moved to dismiss the claims as untimely, and the trial court ruled that the claims were barred by section 2501

because the takings were fixed at the date of the Wilson Order.

The Federal Circuit reversed, holding:

> The EPA's Final Determination "fixed the liability" of the Government.... On this date, the EPA finally fully vetoed the original Project and allegedly denied the claimants the ability to make economically viable use of their property. The EPA hearings on whether to [block the project] did not fix the alleged liability of the Government because the outcome was unknown until the Final Determination issued.... The alleged taking therefore accrued when the EPA issued its actual ... order, not when it started to consider whether to prepare such an order.

41 F.3d at 634. Similarly, issuance of the NITU does not determine the results of the Government's action in the case at bar. The taking becomes fixed only after the parties reach a Trail Use Agreement. Before that date the outcome of the Government action is not certain, so the taking has not been effected.

Although other decisions issuing from this court do not constitute binding precedent, they are helpful in guiding the court to decide cases that are not governed by appellate decisions. The reasoning in *Smith* and *Illig* is sound and is also consistent with Federal Circuit precedent in *Creppel.* Defendant has presented no persuasive argument for jettisoning the analysis that focuses on the permanence of the taking in order to determine when the statute of limitations was triggered. Similarly, plaintiffs have not presented a sustainable argument that the required permanence under takings law occurs only when the deed to the land passes to the interim user. For the purposes of a Fifth Amendment taking in the context of the Trails Act, the court holds that the Government taking is fixed upon the signing of the Trail Use Agreement. At that time the provisions of the NITU become permanent, depriving plaintiffs of their rights in the land in question.

## CONCLUSION

In the case at bar, the City notified the ICC that the parties had reached the Trail

Use Agreement on July 5, 1996. Because plaintiffs' claim was not filed until October 7, 2002—more than six years after the Agreement was announced—that claim is barred by the applicable statute of limitations and must be dismissed.

Accordingly, based on the foregoing, defendant's motion to dismiss is granted, and the Clerk of the Court shall dismiss the complaint without prejudice for lack of subject matter jurisdiction.

No costs.