# United States Court of Appeals for the Federal Circuit

03-5152


WILLIAM B. CALDWELL, III and BEN FRANK BILLINGS, III
(for themselves and as representative of a class of
similarly situated persons),

Plaintiffs-Appellants,

v.


UNITED STATES,

Defendant-Appellee.


Jeffrey O. Bramlett, Bondurant, Mixson & Elmore, LLP, of Atlanta, Georgia, argued for plaintiffs-appellants. With him on the brief were Benjamin E. Fox and Sarah M. Shalf. Of counsel on the brief was James P. Kelly, Kelly Law Firm, P.C., of Atlanta, Georgia.

Kathryn E. Kovacs, Attorney, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Thomas L. Sansonetti, Assistant Attorney General; John Smeltzer, Attorney, of Washington, DC; and Kristine S. Tardiff, Trial Attorney, General Litigation Section, of Concord, New Hampshire. Of counsel on the brief was Evelyn Kitay, Office of the General Counsel, Surface Transportation Board, of Washington, DC.


Appealed from: United States Court of Federal Claims

Judge Christine O.C. Miller

# United States Court of Appeals for the Federal Circuit

03-5152

WILLIAM B. CALDWELL, III, and BEN FRANK BILLINGS, III,
(for themselves and as representative of a class of
similarly situated persons),

Plaintiff-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  December 14, 2004
_____

Before NEWMAN, DYK, and PROST, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> DYK.  Dissenting opinion filed by <u>Circuit Judge</u> NEWMAN.

DYK, <u>Circuit Judge</u>.

Appellants William B. Caldwell, III and Ben Frank Billings, III (collectively "Caldwell") brought a class action lawsuit seeking compensation for an alleged taking pursuant to the National Trail Systems Act (the "Trails Act"), 16 U.S.C. § 1247(d).  The Court of Federal Claims held that the appellants' claim was barred under the applicable statute of limitations, 28 U.S.C. § 2501, because it accrued more than six years before the lawsuit was filed.  <u>Caldwell v. United States</u>, 57 Fed. Cl. 193 (2003).  Because the appellants' claim accrued when the exemption proceedings were halted by the issuance of a Notice of Interim Trail Use or Abandonment ("NITU"), we affirm.

BACKGROUND

I

We have previously held that a Fifth Amendment taking occurs when, pursuant to the Trails Act, state law reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use. Preseault v. United States, 100 F.3d 1525, 1543 (Fed. Cir. 1996) (en banc) ("Preseault II"); see also Toews v. United States, 376 F.3d 1371, 1376 (Fed. Cir. 2004). This case requires us, for the first time, to determine when the Fifth Amendment takings claim accrues for purposes of the six-year statute of limitations under the Tucker Act. 28 U.S.C. § 2501 (2000). The following is a brief summary of the Trails Act, which is described in some detail in Preseault v. Interstate Commerce Commission, 494 U.S. 1, 7-8 (1989) ("Presault I"), the case in which the Supreme Court upheld the constitutionality of the Act under the Commerce Clause.

The Surface Transportation Board (the "STB" or "Board")[1] has authority to regulate the construction, operation, and abandonment of most railroad lines in the United States. A railroad seeking to abandon a railroad right-of-way within the jurisdiction of the STB must either: (1) file a standard abandonment application that meets the requirements of 49 U.S.C. § 10903; or (2) seek an exemption, under 49 U.S.C. § 10502.[2] If the STB approves a standard abandonment application or grants an

---

[1] The Surface Transportation Board is the successor agency to the Interstate Commerce Commission and assumed control on January 1, 1996. 49 U.S.C. § 702 (2000). We use "STB" to refer to both agencies.

[2] Authorization of abandonment pursuant to the exemption procedures of section 10502 is less involved than the standard abandonment proceedings detailed in section 10903 and can be invoked under the statute when it:

exemption and the railroad ceases operation, the STB relinquishes jurisdiction over the abandoned railroad right-of-way and state law reversionary property interests, if any, take effect.  See Preseault I, 494 U.S. at 6-8.

The Trails Act, through a process known as "railbanking," provides an alternative to abandoning a railroad right-of-way under sections 10903 and 10502.  Section 8(d) of the Trails Act allows a railroad to negotiate with a state, municipality, or private group (the "trail operator") to assume financial and managerial responsibility for operating the railroad right-of-way as a recreational trail.[3]  Id. at 6-7.  If the railroad and the trail

---

<table>
<tr><td>(1)</td><td>is not necessary to carry out the transportation policy of section 10101 of [Title 49]; and</td></tr>
<tr><td>(2)</td><td>either (A) the transaction or service is of limited scope; or (B) the [full abandonment proceedings are] not needed to protect shippers from the abuse of market power.</td></tr>
</table>

49 U.S.C. § 10502 (a)(2000). In practice, exemption proceedings are appropriate if no local traffic has run on the line in at least two years.  See Nat'l Ass'n of Reversionary Prop. Owners ("NARPO") v. STB, 158 F.3d 135, 138 n.4 (D.C. Cir. 1998).

[3]    Section 8(d), codified at 16 U.S.C. § 1247(d), provides:

(d) Interim use of railroad rights-of-way

The Secretary of Transportation, the Chairman of the Surface Transportation Board, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976 [45 U.S.C. § 801 et seq.], shall encourage State and local agencies and private interests to establish appropriate trails using the provisions of such programs.  Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.  If a State, political subdivision, or qualified private organization

operator indicate willingness to negotiate a trail use agreement, the STB stays the abandonment process and issues a notice allowing the railroad right-of-way to be "railbanked." 49 C.F.R. § 1121.4. The effect of the notice, if the railroad and prospective trail operator reach an agreement, is that the STB retains jurisdiction for possible future railroad use and the abandonment of the corridor is blocked "even though the conditions for abandonment are otherwise met." NARPO, 158 F.3d at 139; see also Presault I, 494 U.S. at 8. Specifically, section 8(d) provides that "such interim use [for trails] shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). Thus, section 8(d) of the Trails Act prevents the operation of state laws that would otherwise come into effect upon abandonment—property laws that would "result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners." Rail Abandonments—Use of Rights-of-Way as Trails, Ex Parte No. 274 (Sub-No. 13), 2 I.C.C. 2d 591 (1986). A Fifth Amendment taking occurs if the original easement granted to the railroad under state property law is not broad enough to encompass a recreational trail. See Preseault II, 100 F.3d at 1552; see also Toews, 376 F. 3d at 1376.

---

is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Board shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.

The statute does not specify in detail what procedures are to be followed under the Act. Pursuant to implementing regulations promulgated by the STB (and developed pursuant to notice and comment rulemaking), the typical railbanking process begins when a rail carrier files an abandonment application or, as in this case, a request for an exemption. 49 U.S.C. §§ 10903, 10502; see also NARPO, 158 F.3d at 138.

If the STB approves the request for an exemption, it will publish a notice of exemption in the Federal Register. 49 C.F.R. § 1121.4(b) (2004). A potential trail operator may then file a railbanking petition pursuant to 49 C.F.R. § 1152.29(a). Under section 1152.29(a) the petition must include: (1) a map of the right-of-way, (2) a statement indicating that the trail operator will assume financial and legal liability for the right-of-way, and (3) an acknowledgement that the right-of-way may be reactivated for railroad use in the future.[4] If the railbanking petition meets these criteria, and the railroad agrees to negotiate with the petitioner and so communicates to the STB within ten days of the filing of the trail use petition, the STB will issue a Notice of Interim Trail

---

[4]      Specifically the regulation states that:

The . . . petition must include:

> (1) A map depicting, and an accurate description of, the right-of-way . . . proposed to be acquired or used;
> (2) A statement indicating the user's willingness to assume full responsibility: for managing the right-of-way; for any legal liability arising out of the use of the right-of-way . . . and for the payment of all taxes assessed against the right-of-way; and
> (3) An acknowledgement that interim trail use is subject to the user's continuing to meet its responsibilities . . . , and subject to possible future reconstruction and reactivation of the right-of-way for rail service.

49 C.F.R. § 1152.29(a) (2004).

Use or Abandonment ("NITU"). 49 C.F.R. §§ 1152.29(b)(2) and (d). This NITU permits the railroad to discontinue service, cancel tariffs, and salvage track and other equipment, "consistent with interim trail use and rail banking" without consummating an abandonment and the NITU extends indefinitely to permit interim trail use once an "agreement" is reached between the railroad and the trail operator. 49 C.F.R. §1152.29(d)(1.

In some cases, such as that of the recreational trail at issue in Preseault II, an interim trail use agreement may in fact be reached prior to the issuance of the NITU. 100 F.3d at 1549-50. In other cases, however, such as the present case, the NITU is issued after the trail operator and the railroad indicate their intention to negotiate an agreement but prior to the finalization of an agreement.

Only one NITU is issued once the parties indicate their intent to negotiate for conversion of the corridor to trail use. If negotiations go as planned and an agreement is reached, the NITU extends indefinitely for the duration of recreational trail use subject to the trail operator's fulfillment of its agreed-upon obligations. The STB retains jurisdiction for possible future railroad use, and state law reversionary interests that would normally vest upon abandonment are blocked. Preseault I, 494 U.S. at 8. An "escape-clause" is also provided by the NITU such that if no agreement is reached within 180 days, the NITU "automatically converts into an effective . . . notice of abandonment," id. at 7 n.5, which permits the rail carrier to "abandon the line entirely and liquidate its interest." Id. at 7; see also 49 C.F.R. § 1152.29(d)(1). The regulations

also allow the parties to request an extension of the negotiating period if more time is necessary to reach a trail use agreement. 49 C.F.R. § 1152.29(e)(1).[5]

II

On July 5, 1994, the railroad in this case, Norfolk Southern Railway Company ("Norfolk"), filed a request for an exemption under 49 U.S.C. § 10505 (now § 10502) to abandon 7.4 miles of its railroad line located in Columbus, Georgia. Norfolk did not own this right-of-way in fee simple. Rather, Norfolk owned a railroad right-of-way easement that burdened larger parcels over which the line ran. On July 26, 1994, the STB published a notice of abandonment stating that—absent the filing of a petition to stay, e.g., a railbanking petition—the exemption would become effective August 25, 1994. The city of Columbus, Georgia ("the City") filed a railbanking petition and requested issuance of an NITU on August 15, 1994. After receiving notice from Norfolk indicating the rail carrier's willingness to negotiate a trail use agreement with the City, the STB issued an NITU on August 31, 1994. Before the expiration of the 180-day negotiating period, the City and Norfolk filed a "Joint Motion for an extension of the negotiation period provided in the [NITU]" by an additional 180 days. (J.A. at 399.) The City and Norfolk also requested that the NITU be extended to cover an additional 3.2 miles of railroad line adjacent to the 7.4 miles covered by the original NITU.[6] On June 2, 1995,

_____

[5] "The NITU . . . also provide[s] that, if the user [later] intends to terminate trail use, it must send the Board a copy of the NITU and request that it be vacated on a specific date." 49 C.F.R. § 1152.29(d)(2).

[6] Norfolk had already obtained permission in a separate proceeding to abandon the 3.2 mile segment, but had "not removed the tracks or taken any other action to consummate the abandonment." (J.A. at 402.) The decision in this prior proceeding was vacated and the abandonment application for the 3.2 mile segment reopened pursuant to 49 C.F.R. § 1152.29(e)(1), which provides: "[I]f abandonment has not been consummated and the railroad is willing to negotiate, the abandonment

the STB granted both requests. As a result, the proceedings involving the 3.2-mile segment were consolidated with those involving the original 7.4-mile segment, and the NITU negotiating period was extended to August 26, 1995.

On August 17, 1995, Norfolk entered into a purchase and sale agreement ("the purchase agreement") with the Trust for Public Land ("the TPL"), the entity chosen by the City to negotiate the railbanking arrangement. Under the purchase agreement, Norfolk agreed to sell its railroad line right-of-way easement to the TPL for $1,000,000. Payment of the $1,000,000 (less $500 in earnest money) was to occur at a later date along with transfer of title to the right-of-way. The purchase agreement did not set a closing date, but provided that closing would "occur at a mutually agreeable time and location within three hundred sixty five (365) days." (J.A. at 415.) However, the purchase agreement also gave the TPL the right to terminate the purchase agreement "without liability for damages or for an action for Specific Performance, at any time prior to the Closing Date upon five (5) days written notice to [Norfolk]." (J.A. at 420.)

The purchase agreement was amended on April 18, 1996, to make clear that the conveyance was governed by section 8(d) of the Trails Act. On July 1, 1996, a second amendment was made to indicate the TPL's intent to assign its rights under the purchase agreement to the City. The second amendment also required the TPL and Norfolk to cooperate with the City to file a joint motion to further extend the NITU deadline. The following day the TPL assigned its rights under the purchase agreement to the City.

---

proceeding will be reopened, the abandonment decision granting an application, petition for exemption or notice of exemption will be vacated, and an appropriate . . . NITU will be issued."

On July 5, 1996, the City informed the STB that a "railbanking agreement" had been reached, but requested that the NITU deadline be further extended "through the time of the actual transfer of the corridor to the interim trail manager, which [was] anticipated to occur on or before November 1, 1996, and to cover any gaps that may have inadvertently occurred in the railbanking negotiation period." (J.A. at 441-42.) On August 6, 1996, the STB granted the City's motion for an extension "to ensure that the NITU remains in effect until actual transfer of the corridor to the interim trail manager," finding the "extension of the NITU negotiating period [to be] warranted" and that "[a]s long as an abandonment has not been consummated and the railroad agrees to negotiate, the Board's jurisdiction is not terminated." (J.A. at 446.) Norfolk transferred its easement for the 10.6 mile railroad line right-of-way by quitclaim deed on October 9, 1996. The deed was recorded on October 11, 1996.

On November 2, 1996, the City filed a "Notification of Railbanking/Interim Trail Use Agreement" to "formally notify the [STB] that, on October 13, 1996, the railroad lines [were] transferred to the City of Columbus as interim trail manager pursuant to an interim trail use/railbanking agreement." (J.A. at 454.) The notification further stated that "[a]s a result of the successful completion of this railbanking/interim trail use transaction, the NITU should now extend indefinitely." Id. This notice was entered into the STB record on November 5, 1996.

III

The appellants, Caldwell, own land that was burdened by the easement Norfolk owned for the 10.6 mile railroad line right-of-way that was the subject of NITU and the railbanking agreement. On October 7, 2002, Caldwell filed a complaint in the Court of

Federal Claims pursuant to the Tucker Act, 28 U.S.C. § 1491, on behalf of themselves and the class of people who also owned land burdened by the railbanked easement. Caldwell alleged that the government's conversion of the 10.6 mile railroad right-of-way to trail use constituted a compensable taking because the conversion extinguished state law reversionary property interests that would otherwise take effect following the cessation of railroad activities and subsequent abandonment of the easement for railroad use of the right-of-way.

On June 30, 2003, the Court of Federal Claims granted the government's motion to dismiss the complaint because the six-year statute of limitations under 28 U.S.C. § 2501 had run. Caldwell, 57 Fed. Cl. at 204. The court rejected Caldwell's argument that its takings claim accrued within the limitations period, when the right-of-way deed was transferred from Norfolk to the City on October 9, 1996. Id. at 197-99. The Court of Federal Claims also rejected the government's position that the statute began to run upon issuance of the NITU, concluding that the filing of a claim after the issuance of the NITU but before the identification of "an appropriate public agency to operate the trail" would be premature, relying on language in our Preseault II opinion. Id. at 200 (citing Preseault II, 100 F.3d at 1538). Instead, the Court of Federal Claims held that "the Government taking is fixed upon the signing of the Trail Use Agreement. At that time the provisions of the NITU become permanent, depriving plaintiffs of their rights in the land in question." Id. at 203. Thus, the court held that Caldwell's takings claim had to have accrued prior to July 5, 1996, the date the STB was informed that the purchase agreement had been reached. Id. at 203-04. Because Caldwell's claim was not filed

until October 7, 2002, more than six years after July 5, 1996, the claim was barred by the statute of limitations. Id.

Caldwell filed a motion for reconsideration on July 15, 2003, arguing for the first time that a parallel class action, filed in a Kansas district court under the Little Tucker Act, 28 U.S.C. § 1346(a)(2), tolled the statute of limitations on Caldwell's claim. The Court of Federal Claims denied the motion for reconsideration on August 11, 2003. Caldwell timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

We review the legal aspects of the determination by the Court of Federal Claims that the appellants' claim was barred by the statute of limitations without deference. Applegate v. United States, 25 F.3d 1579, 1581 (Fed. Cir. 1994).

I

The appellants argue that the Court of Federal Claims erred by holding that their claim was barred by the statute of limitations. Specifically, Caldwell urges that a taking under the Trails Act did not occur until the railroad line right-of-way was actually converted into a trail for interim trail use on October 11, 1996. We disagree.

The taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. Preseault II, 100 F.3d at 1552; see also Toews, 376 F.3d at 1376. The question, then, is in the context of an exemption proceeding, when are state law reversion interests forestalled by operation of section 8(d) of the Trails Act? We conclude that this occurs when the

railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d).

In implementing the Trails Act, the STB chose to place the primary responsibility for creating railbanking arrangements on the railroad and trail operator. The Board has stated that in order "to promote and expedite the Trails Act process" it has "declined to burden the Trails Act process, unnecessarily either by rule or adjudication." Policy Statement on Rails to Trails Conversions, Ex Parte No. 274 (Sub-No. 13B), slip op. at 4 (I.C.C. Jan. 29, 1990). Indeed, in the STB's view, it "lack[s] discretion to deny or condition a trails use proposal (other than to ensure that the statutory qualifications are met)." Id. at 3. As a result, the NITU is issued only after both the railroad and the trail operator indicate their intent to negotiate a trail use agreement. The process begins when the railroad initiates the abandonment process (either through standard abandonment or exemption procedures). 49 C.F.R. § 1152.29; see also NARPO, 158 F.3d at 138. Subsequently, the interested trail operator files a railbanking petition that meets the statutory requirements reiterated in 49 C.F.R. § 1152.29(a). If the railroad agrees to negotiate a trail use agreement and so communicates to the STB, the STB will issue an NITU as a matter of course. 49 C.F.R. § 1152.29(d)(1). Thus, contrary to the view of the Court of Federal Claims, the NITU is issued only after the trail operator has been identified, and moreover, has indicated its "willingness to assume full financial responsibility and liability for the line and to agree to the railbanking condition for potential future reactivation of rail service." Policy Statement on Rails to Trails Conversions, slip op. at 3.

The issuance of the NITU is the only <u>government</u> action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way. The task of finalizing the trail use agreement under the Trails Act falls entirely on the railroad and trail operator. Indeed, the regulations do not even require the railroad and the trail operator to notify the STB that an agreement has been finalized, although a formal request to vacate the NITU is required if the operator intends at some future time to terminate trail use. 49 C.F.R. § 1152.29(d)(2).

After a final trail use agreement is reached, the NITU remains in effect indefinitely and "abandonment cannot be accomplished under the . . . NITU until trail use terminates (without restoration of rail service)." <u>Policy Statement on Rail Abandonments—Use of Rights of Ways as Trails</u>, Ex Parte No. 274 (Sub-No. 13), 5 I.C.C. 2d 370, 373 (1989) If, however, "no trail use agreement is reached within 180 days, the . . . NITU converts into a . . . notice of abandonment," <u>id.</u>, which "permit[s] the railroad to fully abandon the line." 49 C.F.R. § 1152.29(d)(1); <u>see also</u> <u>Preseault I</u>, 494 U.S. at 7 n.5. If no trail use agreement is reached within 180 days, but the railroad wishes to continue negotiations with the trail operator rather than consummate abandonment, the regulations also allow the NITU to be extended, as was done in this case. 49 C.F.R. § 1152.29(e)(1).

Thus, the NITU operates as a single trigger to several possible outcomes. It may, as in this case, trigger a process that results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked. <u>Preseault II</u>, 100 F.3d at 1552; <u>see also</u> <u>Toews</u>, 376 F.3d at 1376.

Alternatively, negotiations may fail, and the NITU would then convert into a notice of abandonment. In these circumstances, a temporary taking may have occurred.[7] It is not unusual that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues.[8]

Indeed, the Supreme Court has previously contemplated precisely this possibility. In United States v. Dow, 357 U.S. 17 (1958), the Court also grappled with the issue of fixing the accrual of a takings claim. The question was whether the taking accrued at the time when the initial judgment of "immediate possession" was obtained, or three years later, when the government filed a declaration under the Declaration of Taking Act and title formally passed. At issue was respondent Dow's ability to collect compensation from the government, as Dow had purchased the property from the original owner after the government physically occupied the property, but before the formal conveyance of title to the government. Dow had argued that no permanent taking occurred until the filing of the declaration and the formal passage of title, and that only a temporary taking occurred with the government's physical occupation of the land.

The Court held that the taking occurred at the earlier date, when the government entered into physical possession of the land and the owner was deprived of valuable

---

[7] This case does not involve, and we do not herein address, whether the issuance of the NITU in fact involves a compensable temporary taking when no agreement is reached.

[8] See Seiber v. United States, 364 F.3d 1356, 1365 (Fed. Cir. 2004) (denial of permit triggers takings claim that, depending on later government action, may be temporary or permanent); Cooley v. United States, 324 F.3d, 1297, 1299-300 (Fed. Cir. 2003) (same); see also Boise Cascade Corp. v. United States, 296 F. 3d 1339, 1347 (Fed. Cir. 2002) ("[T]he initial denial of a permit is still a necessary trigger for a ripe takings claim. . . . If the government denies a permit, then the aggrieved party can seek compensation. If at some point the government reconsiders the earlier denial and grants

---

property rights, even though title had not formally passed. Id. at 23. The Court rejected, as "bizarre," the argument that there were "two different 'takings' of the same property, with some incidents of the taking determined as of one date and some as of the other." Id. at 24. Rather, the Court endorsed a rule similar to the one that we adopt here, namely that a taking occurs when the owner is deprived of use of the property, there by physical possession, here by blocking the easement reversion. While the taking may be abandoned—in Dow, by the government's possible surrender of possession prior to the formal passage of title, here by the termination of the NITU—the accrual date of a single taking remains fixed. As the Court observed in Dow, the government's decision to abandon the taking "merely results in an alteration in the property interest taken—from full ownership to one of temporary use and occupation." Id. at 26.

We therefore hold that the appropriate triggering event for any takings claim under the Trails Act occurs when the NITU is issued. The NITU marks the "finite start" to either temporary or permanent takings claims by halting abandonment and the vesting of state law reversionary interests when issued. See, e.g., Seiber, 364 F.3d at 1364.

II

Having determined that the appellants' takings claim accrued on the date when the NITU was issued, we must now determine if the six-year statute of limitations bars Caldwell's claim in this case. We hold that the statute of limitations is a bar here under either of the two potential dates of NITU issuance. The first NITU was issued on August 31, 1994, for the 7.4-mile segment. The scope of the NITU was enlarged to cover the

a permit (or revokes the permitting requirement), then the aggrieved party can seek

full 10.6 miles on June 2, 1995. Both of these dates are more than six years before the complaint in this case was filed, and therefore Caldwell's claim is barred by the statute of limitations.

III

Appellants further argue that our decision in Stone Container Corp. v. United States, 229 F.3d 1345 (Fed. Cir. 2000), would apply to toll the statute of limitations during the eleven-month pendency of a class action in Kansas filed by Cheryl Swisher in October 1998.

We conclude that Caldwell has waived on appeal the argument that the statute of limitations was tolled during the eleven-month pendency of the Swisher class action. This issue was first raised below not at trial, but in a motion for reconsideration under Rule 59(a) of the Rules of the Court of Federal Claims. While Caldwell reargues the merits of the tolling argument on appeal, Caldwell did not meet the rigorous standards of RCFC 59(a). Motions for reconsideration must be supported "by a showing of extraordinary circumstances which justify relief." Fru-Con Constr. Corp. v. United States, 44 Fed. Cl. 298, 300 (1999), aff'd, 250 F.3d 762 (Fed. Cir. 2000) (table). In particular, Caldwell fails to refute the court's finding that raising the tolling argument for the first time on a Rule 59(a) motion was improper because the pendency of the 1998 Kansas class action was inherently knowable to Caldwell and should have been raised in response to the government's motion to dismiss for lack of jurisdiction. In any event, even with the claimed eleven months of equitable tolling, Caldwell's filing of October 7,

compensation for a 'temporary regulatory taking'.") (internal footnote omitted).

2002, is barred under the six-year statute of limitations, since his claim accrued no later than June 2, 1995.

## CONCLUSION

We hold that the Fifth Amendment taking, if any, under the Trails Act is accomplished when an NITU is issued and state law reversionary interests that would otherwise take effect pursuant to normal abandonment proceedings are forestalled. Because Caldwell's claim was filed on October 7, 2002,  more than six years after either of the NITUs issued in this case, that claim is barred by the statute of limitations under 28 U.S.C. § 2501.   The decision of the Court of Federal Claims dismissing the appellants' claim is

## AFFIRMED.

## COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

03-5152

**WILLIAM B. CALDWELL, III, and BEN FRANK BILLINGS, III,**
**(for themselves and as representative of a class of**
**similarly situated persons),**

             **Plaintiffs-Appellants,**

      **v.**

      **UNITED STATES,**

             **Defendant-Appellee.**

**NEWMAN, <u>Circuit Judge</u>, dissenting.**

I respectfully dissent from the court's ruling that the statute of limitations started to accrue from a date before the Caldwell property was "taken" in Fifth Amendment terms. All authority is contrary to this position.

Neither the dates of the Interstate Commerce Commission's authorization to the Norfolk Southern Railroad to abandon railroad use and negotiate transfer of the easement (the ICC's Notices of Intent to Use, whose dates of August 31, 1994 and June 2, 1995 are selected by the panel majority as the dates on which the statute of limitations started to accrue), nor the date the City of Columbus notified the ICC of the intended trail use (the date of July 5, 1996 chosen by the Court of Federal Claims)

was an actionable taking of property. Neither event vested a cause of action in the owner of the fee, for neither event was a ripened taking. Neither the federal approval to discontinue railway operations, nor the ongoing negotiation between the railway and the city concerning conversion to trail use, vested a right of compensation by the United States. Thus neither of these events started accrual of the six-year period of limitations of 25 U.S.C. §2501. See Alliance of Descendants of Texas Land Grants v. United States, 37 F.3d 1478, 1481 (Fed. Cir. 1994) ("a claim under the Fifth Amendment accrues when the taking action occurs"); Steel Improvement & Forge Co. v. United States, 355 F.2d 627, 631 (Ct. Cl. 1966) (same).

A Fifth Amendment taking can indeed flow from a Trails Act conversion of a railway easement. See Presault v. United States, 100 F.3d 1525, 1553 (Fed. Cir. 1996) (en banc). However, these plaintiffs could not have prosecuted their claim until the taking occurred. The taking occurs "when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action." Seldovia Native Association, Inc. v. United States, 144 F.3d 769, 774 (Fed. Cir. 1998). Until the easement was transferred to the City of Columbus, Norfolk Southern Railroad not only continued as owner of the right-of-way, but retained all of the benefits and obligations of ownership, including the right to exclude, the obligation to pay taxes, and liability for injury and liens. Until the right of trail use was vested in the City the cause of action had not ripened, and liability of the government for compensation was not fixed. Suit at this stage would have simply been premature; the statute of limitations can not start to accrue before suit could have been filed.

03-5152                                      2

Under the Trails Act and its implementing regulations, not only must an "interim trail manager" (the City of Columbus) be approved by the ICC, but the interim trail manager must "assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way." 16 U.S.C. §1247(d) (1994). These obligations were not incurred until transfer of the deed at the legal Closing; until the Closing, the railroad continued to own the right-of-way, the City of Columbus did not possess and could not occupy the property, and the City could not convert it into a recreational trail. Until these events occurred the owners of the fee were not "clearly and permanently deprived," and the liability of the government to pay compensation was not fixed. See Presault v. Interstate Commerce Comm'n, 494 U.S. 1, 7-8 (1989) (conversion to trail use may be subject to Tucker Act remedy for Fifth Amendment taking); Seldovia, 144 F.3d at 774 ("the key date for accrual purposes is the date on which Seldovia was clearly and permanently deprived of the lands it had selected").

On October 9, 1996 the Norfolk Southern Railroad conveyed to the City of Columbus the deed for the l0.6 mile right-of-way. I cannot agree that the plaintiffs could have brought earlier suit and obtained compensation for this taking, based on the ICC's authorizations on August 31, 1994 and June 2, 1995 to Norfolk Southern to negotiate a Trails Act conversion. These preliminary events did not fix a ripe takings claim. Negotiation of a possible future event may state a hope and a plan, but it is not a fixed, ripe, and compensable taking. The owners of the fee had no right to

03-5152                                    3

compensation based on or at the time of these authorizations to negotiate; thus these authorizations could not accrue the period of limitations.

Nor were the various negotiating documents involving the City of Columbus, starting with the document of August 17, 1995 styled "Purchase Agreement," an actionable taking. This Agreement, from which the City could withdraw on five days' notice, was amended on April 18, 1996 to add the Trails Act's requirement that the manager accept financial and legal responsibility; this acceptance in turn was conditioned on completion of the transaction, and only then would become operable. Thus an Amendment to the Purchase Agreement stated that "at closing Buyer, its successor or assignee, shall assume full responsibility for the management of the right of way, for any legal liability arising out of its transfer or use, and for any payment of taxes in accordance with the requirements of section 8(d)." Another amendment dated July 1, 1996 provided that the City and the railroad would jointly request the ICC (now named the Surface Transportation Board) to extend the time period for negotiation of a "mutually acceptable interim trial use/railbanking agreement" through and including November 1, 1996. Thus the Agreement itself documented its own negotiating status; these documents could not have formed the basis of a takings action by July 5, 1996, as the Court of Federal Claims held in selecting the date when the City and the railway jointly requested the time extension for further negotiation. This Agreement and its amendments were recordations of the negotiation, not a completed transaction having Fifth Amendment consequences.

Taking claims accrue when the liability of the government is fixed, not simply prospective. In <u>Hopland Band of Pomo Indians v. United States</u>, 855 F.2d 1573 (Fed. Cir. 1988) the court reiterated that

> for the purposes of section 2501, it would appear more accurate to state that a cause of action against the government has 'first accrued' only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence.

<u>Id.</u> at 1577. These events occurred when the City acquired the deed and the right to occupy and use the property. The Court explained in <u>Nollan v. California Coastal Comm'n</u>, 483 U.S. 825, 832 (1987), that permanent physical occupation occurs "where persons are given a permanent and continuous right to pass to and fro." That did not occur until the Closing, when the deed and the right of occupancy and use were transferred.[1] Before these events the period of limitations did not start to accrue, for neither the ICC's Notice that permitted negotiation for trail use, nor the various documents implementing those negotiations, ripened a claim for compensation. Intentions are rarely actionable; it is the consummation that accrues legal rights.

The panel majority places great weight on <u>United States v. Dow</u>, 357 U.S. 17 (1958). In <u>Dow</u> the Court held that a taking occurs upon possession and occupancy of the property, and that a subsequent filing under the Declaration of Taking Act did

---

[1] It is not necessary to decide whether the date of accrual of the limitations period was the transfer of the deed at the Closing on October 9, 1996, or its recordation a few days later, or the Notification from the City of Columbus to the ICC on November 5, 1996, because this suit was filed within six years of the earliest of these dates.

not negate the effect of the earlier possession and occupancy.  Id. at 22.  In Dow the government in 1943, by eminent domain, obtained a judgment of "immediate possession" of a right-of-way through a larger tract of land, entered into immediate possession of the right-of-way, and within ten days began laying a pipeline through the tract.  In 1945 the owners conveyed the entire tract to Dow, including their right to any compensation for the land taken by eminent domain; and in 1946 the government filed in court a declaration of taking, obtained title to the right-of-way, and deposited estimated compensation with the court.  The issue was Dow's rights under the Assignment of Claims Act; there was no issue of the running of a statute of limitations. The Court held that the taking occurred when the United States entered into possession in 1943, when the government "entered and appropriated the property to public use," id. at 23,  and that the taking neither awaited the later transfer of title to the right-of-way, nor was negated by the later proceeding.  The Court stressed that the determinative event of the taking was whether "the Government has already entered into possession."  Id. at 25.  This case well supports the plaintiffs herein.

It is not disputed that the City of Columbus did not possess and occupy the property, and had no authorization or right to do so, until the Closing and transfer of the deed.  Although the panel majority relies heavily on Dow, the analogy is not apt.  In Dow the government was in full possession of the property it had obtained by condemnation decree and was actively building the pipeline; thus the Court held that the taking had occurred.  In contrast, the authorization from the ICC to the Railway

and the City to start to negotiate did not change the possession and occupancy of the easement. My colleagues' view that it is irrelevant when title passes does not mean that the property was earlier taken; that is not the rule of <u>Dow</u>. To the contrary, <u>Dow</u> strongly reinforces the position that the Norfolk Southern right-of-way was not taken and compensable until there was a transfer of possession and occupancy, an event that did not occur until the date of Closing and the transfer of the deed.

Thus I must, respectfully, dissent from the court's conclusion that the statute of limitations started to accrue when the parties told the ICC that they were negotiating for the purpose of reaching a trail use agreement.