**Jack LADD et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 07–271L.**

United States Court of Federal Claims.

Oct. 14, 2009.

Mark Fernlund Hearne, II, Lathrop & Gage, St. Louis, MO, for plaintiff.

James David Gette, Trial Attorney, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

Andrea Carol Ferster, Rails–to–Trails Conservancy, Washington, DC, for amicus.

## ORDER AND OPINION

HODGES, Judge.

This is a Rails–to–Trails case. Plaintiffs are owners of property abutting or surrounding a railway corridor in southern Arizona. The landowners allege a physical taking of their reversionary rights in the property underlying the right-of-way. The railroad right-of-way is no longer in use. Defendant filed a motion for summary judgment, contending that such lands belong to the railroad in fee simple. A taking cannot exist where the claimants did not own the property complained of.

Plaintiffs seek a declaration from the court that they own the railroad right-of-way in fee. Defendant contends that any taking would have to be analyzed according to the *Penn Central* factors as a regulatory taking based on delay. The case is before us on cross-motions for summary judgment.

Plaintiffs cannot argue a physical taking as the record stands. Railroad owners must obtain permission from the Surface Transportation Board to abandon service on a rail line. The San Pedro Railroad Operating Company has applied for permission to abandon its service along the corridor complained of by plaintiffs, but the federal abandonment process is not final. The railroad may negotiate with trail operators to transfer rights to the corridor for use as a public trail. So far, however, the regulatory process has not resulted in creation of a trail along the right-of-way. The Government cannot have effected a physical taking in such circumstances.

## BACKGROUND

The Federal Government has regulated interstate railroad operations since early in the twentieth century. The Transportation Act of 1920 created a regulatory framework for supervising abandonment of railroad corridors, managed initially by the Interstate Commerce Commission. *See* Transportation

Act of 1920, Pub.L. No. 66–152, 41 Stat. 456 (1920). The ICC had exclusive regulatory authority over the construction, operation, and abandonment of rail lines in the United States. The Railroad Revitalization and Regulatory Reform Act of 1976 contained amendments designed to strengthen the Government's regulatory authority in this area. Pub.L. No. 94–210, 90 Stat. 31 (1976).

Congress made additional changes in 1983, when it created a process known as "railbanking." *See* 16 U.S.C. § 1241 (2006); *Caldwell v. United States*, 391 F.3d 1226, 1229 (Fed.Cir.2004) (citing *Preseault v. I.C.C.*, 494 U.S. 1, 6–7, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990)). The purpose of railbanking was to promote the preservation of railroad corridors by creating recreational trails along the abandoned right-of-ways for use by the general public. Known informally as "Rails–to–Trails," this program encourages non-governmental groups to assume financial and managerial responsibility for recreational trails along former railroad right-of-ways. *Caldwell*, 391 F.3d at 1229; *see also Preseault*, 494 U.S. at 17–18, 110 S.Ct. 914. Conversion of railroad right-of-ways to public trails normally forestalls abandonment of railroad easements, and "banks" them for possible future use as railroads. 16 U.S.C. § 1247(d) (2006).

The railbanking process begins when a rail carrier seeks permission from the Surface Transportation Board to abandon service on a rail line. 49 U.S.C. § 10903 (2000).[1] The Board publishes a notice in the Federal Register announcing availability of the corridor to qualified parties who may be interested in creating a trail. Such parties file petitions stating their willingness to assume responsibility for management and maintenance of a recreational trail along the right-of-way. 49 C.F.R. § 1152.29(c)-(d).

If the railroad is willing to negotiate a trail use agreement, the Board issues a Notice of Interim Trail Use (NITU). The NITU delays abandonment of the railway for 180 days, during which time the carrier may discontinue service and salvage its tracks. Interested parties may negotiate with the railroad for control and maintenance of the corridor during the 180–day period. 16 U.S.C. § 1247(d) (2006); *Goos v. Interstate Commerce Comm'n*, 911 F.2d 1283, 1295 (8th Cir.1990) (noting that the Commission "must issue an NITU ... when a private party files a statement of willingness to assume financial responsibility and the railroad agrees to negotiate.").

If a trail operator reaches an agreement with the railroad, the NITU authorizes conversion of the right-of-way to use by the general public as a trail. The rail carrier may reassert control of the easement for railroad use at any time. 49 C.F.R. § 1152.29(d)(2). The NITU blocks abandonment of the right-of-way, and the Surface Transportation Board retains jurisdiction of the corridor for future railroad use.[2] *See Nat'l Ass'n of Reversionary Prop. Owners v. Surface Transp. Board*, 158 F.3d 135, 139 (D.C.Cir.1998).

If a railroad does not reach an agreement with trail operators, it may abandon the rail line by filing a Notice of Consummation of Abandonment. 49 C.F.R. § 1152.29(e)(2). The Notice of Consummation terminates the Surface Transportation Board's jurisdiction over the abandoned corridor. *Caldwell*, 391 F.3d at 1228–29. The railroad must file its Notice of Consummation of Abandonment within one year after the abandonment process begins. 49 C.F.R. § 1152.29(e)(2). The railroad may request an extension of time to negotiate trail use, but if it does not notify the Board of abandonment within the extended period, the railroad's right to abandon lapses. *Id.* Thereafter, the Board may require a railroad to hold the corridor indefinitely.

## FACTS

Plaintiffs are property owners along a seventy-six mile railroad corridor in Cochise County, Arizona. The corridor has been

---

**1.** A railroad may also apply for an exemption from the regulatory requirement to provide service, but that alternative is not relevant here.

**2.** Duties of the Interstate Commerce Commission were transferred to the Surface Transportation Board in 1995. *See* ICC Termination Act of 1995, Pub.L. 104–88, 109 Stat. 803 (1995).

used by the San Pedro Railroad Operating Company as successor to the El Paso and Southwestern Railroad. The Railroad acquired its rights to the corridor through federal and private conveyances between 1875 and 1911.

The Railroad filed a petition in October 2005, to obtain approval for abandonment of its rail service along the seventy-six mile stretch of rail in which plaintiffs claim an interest. The Surface Transportation Board notified the Railroad in November 2005 that it could proceed with the abandonment process. The Trust for Public Land Use filed a request for a public use condition in January 2006. The Trust is a non-profit California public benefit corporation. The Trust also submitted a statement of willingness to assume financial responsibility for the right-of-way, and acknowledged that use of the right-of-way as a trail would be subject to future reconstruction and reactivation of the rail line. *See* 16 U.S.C. § 1247(d) (2006).

The Board issued a Notice of Interim Trail Use in July 2006. The NITU authorized a 180–day negotiation period that later was extended to February 21, 2007 for part of the corridor.[3] Negotiations between the Railroad and the Trust were not successful.

The Railroad sought an extension of its deadline for filing a Notice of Consummation of Abandonment in July 2007. Government counsel represented during oral arguments this year that the Railroad had requested a second extension to complete the abandonment process. We have not been notified that the Railroad has completed the abandonment process or has reached an agreement with trail operators. The Board retains jurisdiction over the rail corridor until

the Railroad files a Notice of Consummation of Abandonment.

## ARGUMENTS

Plaintiffs argue that the Board's issuance of a Notice of Interim Trail Use delayed their rights to reclaim the land underlying the abandoned rail corridor. They believe that the negotiation period created by the NITU prevented abandonment of railroad easements along the line and the consequent removal of burdens on their property. That is, the Surface Transportation Board's NITU prevented vesting of plaintiffs' reversionary rights. The landowners would have regained full possession and use of lands previously burdened by railroad easements, but for the Board's NITU.

Plaintiffs note that "[e]very court to consider the issue has held that when the Trails Act precludes a property owner from regaining the 'reversionary rights' which the owners possess under state law it is [a] taking of the owner's property for which the federal government must pay 'just compensation.' "[4] Relying on *Caldwell* and *Barclay,* plaintiffs assert that the taking runs from the date of the Notice of Interim Trail Use. *See Barclay v. United States,* 443 F.3d 1368 (Fed.Cir. 2006); *Caldwell,* 391 F.3d at 1234; *Preseault v. United States,* 100 F.3d 1525 (Fed.Cir. 1996).

Plaintiffs' case depends on comments by the Federal Circuit in the *Caldwell* decision. *See* 391 F.3d at 1233 (stating that a taking occurs upon the Government's filing a NITU, "when the state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting.").[5]

---

3. A portion of the line was fully abandoned in January 2007, when the Railroad filed a Notice of Consummation for that portion only.

4. Every court to consider a taking of reversionary rights in the rails-to-trails context did so given the existence of a trail used by the general public, established along the railroad corridor. Negotiations for a trail in this case have failed so far; no trail exists to date.

5. *Caldwell* addressed the issue of when the statute of limitations begins to run in a Rails–to–

Trails case. The trial court had held that the railroad's transfer of its property interests in the corridor to a trail operator marked the taking's beginning for purposes of the statute of limitations. The Federal Circuit reversed, holding that the Surface Transportation Board's issuance of the NITU established a physical taking where negotiations result in creation of a trail. *Caldwell,* 391 F.3d at 1233. Issuance of the NITU prevented abandonment of the easement, according to the appeals court. *See id.*

Plaintiffs seize upon *Caldwell* to argue that the six-month NITU negotiations period was a taking in this case because it prevented them from regaining property that should have reverted pursuant to state law.[6] The facts that trail operators have not reached an agreement with the Railroad to establish a trail, and that the regulatory abandonment process has not ended, affect only the amount of damages, according to plaintiffs. They do not limit the Government's takings liability.[7]

The Government argues that plaintiffs can claim only temporary interference with their reversionary rights. Such a delay would be analyzed in a regulatory taking framework, according to defendant, not as a physical taking. *Caldwell* began with a NITU, but it ended with a permanent physical invasion caused by public use of the resulting recreational trail.

The six-month negotiation period required by the NITU is analogous to the moratorium on development in *Tahoe–Sierra*, defendant believes. *See Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).[8] As in *Tahoe*, the NITU could not be a regulatory taking because plaintiffs have not alleged or proved an " 'extraordinary delay' in the challenged regulatory process," according to defendant. The Government cites Federal Circuit decisions in which extraordinary delay was required for a compensable taking as a result of the regulatory

process. *See, e.g., Boise Cascade Corp. v. United States*, 296 F.3d 1339 (Fed.Cir.2002); *Wyatt v. United States*, 271 F.3d 1090 (Fed. Cir.2001); *see also Tahoe–Sierra*, 535 U.S. at 338 n. 34, 341–42, 122 S.Ct. 1465 (stating that length of the delay is a factor to consider in the regulatory takings analysis).

The six-month NITU period cannot be an extraordinary delay when this court, the Federal Circuit, and the Supreme Court have found no compensable taking despite multi-year delays, defendant contends. *See, e.g., Tahoe–Sierra*, 535 U.S. at 341–42, 122 S.Ct. 1465 (rejecting a rule that all moratoria over a year constitute a categorical taking in affirming the appeals court's rejection of a thirty-two month moratorium as compensable); and *Wyatt*, 271 F.3d at 1098–1100 (holding that a multi-year delay in a permitting process did not constitute extraordinary delay in the circumstances of that regulatory scheme).

### DISCUSSION

■ Plaintiffs must establish ownership of the property affected when the alleged taking occurred. In this case, "ownership" refers to plaintiffs' rights to the land underlying the railroad corridor. If the Railroad's chain of title establishes that it owns the railway corridor in fee simple, plaintiffs do not have a case; the land under the easement would not be theirs to reclaim.

---

6. This argument assumes that plaintiffs' reversionary property interests had vested under state law or otherwise. This Opinion does not consider whether the corridor had been "abandoned" under state law when the Board issued the NITU. Plaintiffs did not argue the application of state abandonment law to the facts of this case, or attempt to try title in state court. Courts have not ruled directly whether federal law has preempted state abandonment laws as they apply to railroad right-of-ways. Neither party briefed or argued that issue in this case.

7. Plaintiffs have not made clear whether they seek compensation for the time that the NITU remained in effect, or for the subsequent period during which the railroad has not filed its Notice of Consummation of Abandonment, or for both.

8. Landowners in *Tahoe–Sierra* objected to a series of temporary prohibitions on development. They argued that "a temporary deprivation—no

matter how brief—of all economically viable use[ ] trigger[s] a *per se* rule that a taking has occurred." 535 U.S. at 320, 122 S.Ct. 1465. The Supreme Court rejected plaintiffs' approach in *Tahoe–Sierra*, focusing instead on whether the government entity occupied the property. *See id.* at 322, 122 S.Ct. 1465. If it does, it is a physical taking; if it does not, it is potentially a regulatory taking. *Id.* The Court rejected the *per se* approach of *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), because the thirty-two month moratorium was not a total deprivation of use, but a temporary one. *Id.* at 332, 334–37, 122 S.Ct. 1465. The Court confirmed that the *Penn Central* factors were to be employed where a moratorium did not result in permanent destruction of the property's value. *Id.* at 337, 122 S.Ct. 1465.

■ Real property rights are established in this court by reference to applicable state laws. *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980); *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). State property laws determine the nature of plaintiffs' property interests in the lands they claim have been taken by the Government.[9] The applicable state property law in this case is that of Arizona.

### Plaintiffs' Property Interests

■ Plaintiffs contend that all ten original conveyances to the Railroad for the right-of-way were easements that revert to the fee owners upon abandonment. Language normally used to grant a fee simple estate does not apply when railroads are grantees, plaintiffs argue.[10] They cite Arizona cases that interpret the term "right-of-way" in conveyances to railroads to mean only easements. The important issue for these purposes is not whether the term "right-of-way" in a deed means "easement," but who has fee title to the lands under the right-of-ways or easements. Arizona law does not provide that language granting fee title to a railroad always results in a right-of-way or an easement.

■ The Arizona Court of Appeals has held that a fee simple title is not transformed into a lesser estate merely because language in the conveyance includes the purpose of the grant. *Lacer v. Navajo County,* 141 Ariz. 396, 687 P.2d 404, 408–10 (App.1983). According to the *Lacer* court, inclusion in a deed of its intended purpose—in that case, for use as a courthouse—did not create a fee subject to a condition subsequent or a fee simple determinable. The court held that such a deed would require language providing that the grantor could re-enter or that the fee would revert automatically upon cessation of the use for the purpose stated. 687 P.2d at 408–410.

■ Defendant's view is that *all* deeds in question grant unambiguous fee title to the Railroad. It contends that the stated purpose in the deeds—a railroad right-of-way—should not interfere with what defendant believes would otherwise be a conveyance in fee, citing *Lacer.* Plaintiffs respond that *Lacer* has no bearing on this case because it did not involve a conveyance to a railroad. While *Lacer* did not involve conveyances to railroads, the case does establish that conditions subsequent do not necessarily diminish a fee title estate. To have such an effect, the deed must include language allowing the grantor to re-enter, or causing the fee estate to revert automatically. *See id.*

### No Physical Taking

■ A physical taking cannot have occurred in these circumstances, where neither the NITU nor another aspect of the federal abandonment process has resulted in construction of a trail for public use. Issuance of a NITU cannot be a physical taking where the landowners have not suffered a physical invasion of the property in which they claim interests. *See Tahoe–Sierra,* 535 U.S. at 321–22, 322 n. 7, 122 S.Ct. 1465; *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 440, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (stating that regulations not requiring a physical occupation of the property by the Government will be analyzed according to regulatory takings standards); *Tuthill*

---

9. The nature of plaintiffs' rights to lands underlying the right of way is no longer relevant to the holding in this case because the abandonment process continues as this Opinion is issued. *See* pages 226–27, *infra.* The Railroad has not filed its Notice of Consummation of Abandonment.

10. Federal courts of appeals have held that conveyances for rail lines are presumed to be easements, but those cases were decided according to property laws other than Arizona's. *See Preseault I,* 100 F.3d at 1535–36 (Fed.Cir.1996) (interpreting Vermont law); *Penn Central Corp. v. U.S.R.R. Vest Corp.,* 955 F.2d 1158, 1160 (7th Cir.1992) (citing legal presumptions in Indiana, California, Kentucky, and Ohio that a deed to a railroad creates a terminable easement). Seventeen other states have produced similar holdings, according to plaintiffs' citations. Arizona courts have ruled that deeds must be construed with reference to unambiguous language contained therein. *See e.g., Pass v. Stephens,* 22 Ariz. 461, 198 P. 712, 714 (1921); *Spurlock v. Santa Fe Pac. R.R. Co.,* 143 Ariz. 469, 694 P.2d 299, 304 (App. 1984).

*Ranch, Inc. v. United States,* 381 F.3d 1132, 1135 (Fed.Cir.2004) (reiterating that the issue in a physical takings claim is whether the Government physically occupied the plaintiff's property). Conversion of a railroad right-of-way to a public trail has been the physical invasion necessary to finding takings in earlier Rails–to–Trails cases. *See, e.g., Barclay v. United States,* 443 F.3d 1368, 1372; *Caldwell,* 391 F.3d at 1228, 1232; *Preseault,* 100 F.3d at 1551–52.

Plaintiffs' position vis-a-vis the railroad is the same now as it was before the Surface Transportation Board issued the Notice of Interim Trail Use.[11] The landowners rely entirely on cases in this court that permit damages for physical takings of reversionary rights. Such arguments do not acknowledge the important distinguishing factor in those cases—the railroad agreed to allow trail operators to use the corridors for trails. The Government, through its abandonment process, made possible the physical occupation of the right-of-ways by the general public. The railroad corridor in this case remains within the railroad's control as this Opinion is drafted. The railroad holds the key to completing the regulatory abandonment process. The NITU has not effected a change of status in plaintiffs' property interests.[12]

*Caldwell* and *Barclay* suggest that temporary takings could occur in some circumstances, but those cases addressed applicable statutes of limitations for takings in this court. The facts of both cases included successful negotiations for establishing public trails. Decisions in this Circuit rely on a physical invasion to find the taking alleged by plaintiffs here. A physical presence by the general public, made possible by government action, is the crucial element so far missing from this case.

## CONCLUSION

Plaintiffs' theory of this case has uncertain application where no trail exists, no physical presence has been authorized, and the alleged delay is limited to a six-month period of negotiation imposed by the NITU. They might have argued additional delay from the railroad's unexplained requests for extensions of time to file its Notice of Consummation of Abandonment. However, any takings claim based on unreasonable delay would be analyzed according to the *Penn Central* balancing tests and by standards established in *Tahoe.* Plaintiffs have not alleged, briefed, or argued a regulatory taking, which would be difficult to prove in any event given the legal standards applicable to such a claim.

This court has found physical takings in rails-to-trails cases where railroads have reached agreements with non-profit organizations to maintain trails for use by the general public on railroad right-of-ways. Such use provides the physical invasion of plaintiffs' property interests that is necessary to find a physical taking by the United States. Plaintiffs cannot show a physical presence by the general public that was caused by government action. Operation of the Rails–to–Trails program has not created a compensable physical taking under the Fifth Amendment in this case because a trail is not established along the railroad corridor as this Opinion and Order is filed.

11. The parties did not brief or argue the possibility that lands subject to the easements had been abandoned under state law before the Government's abandonment process began. *See Ellamae Phillips Co. v. United States,* 564 F.3d 1367, 1370, 1373–74; *see also Preseault II,* 100 F.3d at 1550 (citing *Presault I,* 494 U.S. at 22, 110 S.Ct. 914 (O'Connor, J., concurring) (Board's regulatory jurisdiction over abandonment of statutory requirements to provide rail service is entirely separate from the question of state law abandonment)). Justice O'Connor explained in her concurrence in *Preseault I,* "[a]lthough the Interstate Commerce Commission's actions may pre-empt the operation and effect of certain state laws, those actions do not displace state law as the traditional source of the real property interests."

494 U.S. at 22, 110 S.Ct. 914 (O'Conner, J., concurring). Federal regulations may defer, delay, or even "defeat" enjoyment of a property interest, but they do not suspend the vesting of a reversionary interest. *Id.* In certain circumstances, the delay or defeat of a property interest will be compensable under the Fifth Amendment. *Id.* at 23, 110 S.Ct. 914.

12. We conducted a hearing earlier this year to determine the status of negotiations and the likelihood of eventual action. The Government reported that the railroad would seek another extension of time to complete its abandonment process. That extension remains in effect, so far as we know.

Plaintiffs argued deed construction under Arizona law at some length. We analyzed each of the plaintiff's property interests according to deeds supplied by the Government. That discussion is irrelevant, however, given the fact that plaintiffs cannot establish a physical taking as this Opinion is issued. Similarly, we have not addressed jurisdictional aspects of plaintiffs' request for a declaratory judgement.

Defendant's motion for summary judgment is GRANTED. All other motions outstanding are moot, and therefore DENIED. The Clerk of Court will dismiss plaintiffs' Complaint. No Costs.