**B.P. BUFORD, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 09–121–L.**

United States Court of Federal Claims.

Feb. 7, 2012.

524

Robert Sears, Baker Sterchi Cowden & Rice, Kansas City, MO, for Plaintiffs.

Joshua Doan, Environment & Natural Resources Division, Natural Resources Section, Department of Justice, Washington, D.C. with whom was Ignacia S. Moreno, Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C. for Defendant.

### OPINION and ORDER

SMITH, Senior Judge:

Pending before the Court are the Parties' Cross–Motions for Summary Judgment in a "rails-to-trails" case. Plaintiffs include 15 Mississippi property owners who allege a Fifth Amendment taking of their properties, which were subject to a railroad right-of-way in Warren County, Mississippi.

Pursuant to a Petition for Exemption to abandon its rail line, the Surface Transportation Board allowed Kansas City Southern Railroad to enter into an agreement with the City of Vicksburg to convert the railroad line into a recreational trail. Plaintiffs argue that the Railroad only acquired an easement from two deeds and by adverse possession. In addition, Plaintiffs argue that the Railroad's easement was limited to railroad purposes, and a recreational trail is beyond its scope. As a result, Plaintiffs argue that by permitting the conversion of the right-of-way to a trail, their reversionary interest in the land was taken and they are entitled to just compensation.

On the other hand, the Government argues that is entitled to Summary Judgment on

liability for four reasons. First, the Government argues that the Railroad held fee simple title in the subject right-of-way. Second, the Government argues that Plaintiffs fail to point to sufficient evidence to demonstrate that they own property abutting segments of the Railroad right-of-way. Third, the Government contends that seven Plaintiffs do not own land abutting the right-of-way because a road, dedicated by plat, separates their properties from the right-of-way. Lastly, the Government argues that railbanking and trail use are within the scope of the Railroad's easement.

For the reasons stated below, the Court finds that the conversion of the Railroad right-of-way to a recreational trail amounted to a taking of Plaintiffs' property under the Fifth Amendment. As will be discussed, Plaintiffs' Motion for Summary Judgment on liability is **GRANTED,** and the Government's Cross-Motion is **DENIED.**

## I. *The Trails Act and its Implementation*

■ The Trails Act was implemented to preserve unused railroad right-of-ways by converting them into recreational trails. *Barclay v. United States,* 443 F.3d 1368, 1371 (Fed.Cir.2006). Nevertheless, a Plaintiff can assert a Fifth Amendment takings claim "when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." *Ladd v. United States,* 630 F.3d 1015, 1019 (Fed.Cir.2010).

■ Stemming from the Interstate Commerce Act of 1887, as revised and amended, the Transportation Act of 1920 (41 Stat. 477–78), and subsequent statutes, the Surface Transportation Board ("STB") is charged with regulating the construction, operation, and abandonment of railroad lines in the United States. *Chic. & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 311–12, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981); *Caldwell v. United States,* 391 F.3d 1226, 1228 (Fed.Cir.2004). The STB must grant a railroad approval to discontinue or abandon a railroad corridor. *Nat'l Ass'n of Reversion-*

*ary Prop. Owners ("NARPO") v. STB,* 158 F.3d 135, 137 (D.C.Cir.1998).

■ A railroad may terminate active rail service in one of three ways. First, a railroad may apply to discontinue service. *Preseault v. ICC,* 494 U.S. 1, 6 n. 3, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). Second, a railroad may seek to abandon the right-of-way. *Hayfield N. R.R. v. Chic. & N.W. Transp. Co.,* 467 U.S. 622, 633, 104 S.Ct. 2610, 81 L.Ed.2d 527 (1984). As in this case, the third option for terminating railroad service is "railbanking." While railbanking is a form of discontinuance, the right-of-way is said to be " 'banked' until such time as railroad service is restored." *Caldwell v. United States,* 57 Fed.Cl. 193, 194 (2003), *aff'd,* 391 F.3d 1226 (Fed.Cir.2004). Unlike standard discontinuance, railbanking allows a third party to accept full responsibility of the railroad corridor and allows interim trial use until active rail service is restored.

■ Thus, to initiate abandonment, the railroad must file an Application or a Notice of Exemption. Under the Trails Act, railbanking provides an alternative to abandonment. After the Application or Notice of Exemption is filed, a state, municipality, or private group can submit a proposal for converting the railroad into a trail. *Barclay v. United States,* 443 F.3d 1368, 1376 (Fed.Cir. 2006). The STB's regulation requires that the proposal include a statement of willingness to assume responsibility for the right-of-way, and an acknowledgment that interim trail use is subject to the "possible future reconstruction and reactivation of the right-of-way for rail service." 49 C.F.R. § 1152.29(a)(1)–(3).

■ If the railroad and the prospective railroad operator agree to negotiate a trail use agreement, the STB "stays the abandonment process and issues a notice allowing the railroad right-of-way to be 'railbanked.'" *Caldwell,* 391 F.3d 1226, 1229; *Citizens Against Rails–to–Trails v. STB,* 267 F.3d 1144, 1150–53 (D.C.Cir.2001). As was done in this case, if a railbanking and interim trail use agreement is reached, the Notice of Interim Trail Use ("NITU") automatically authorizes the trail use, and "the STB retains

jurisdiction for possible future railroad use." *Caldwell,* 391 F.3d 1226, 1230. If a trail use agreement is not reached, the NITU expires 180 days after its issuance. 49 C.F.R. § 1152.29(d)(1).

In this case, the event that is alleged to be a taking is the issuance of the NITU. This is because it is the only government action in the railbanking process that prevents abandonment of the railroad and restricts the vesting of state law reversionary interests. *Caldwell,* 391 F.3d at 1235. Consequently, this is the basis of Plaintiffs' Fifth Amendment takings claim.

## II. *Factual Background*[1]

### A. The Property

▮ This case involves portions of a 4.25–mile railroad right-of-way in Warren County, Mississippi acquired from 15 landowners through two deeds and by adverse possession[2], dating back to the 1870s.[3] The railroad line ("Line") on the subject right-of-way was referred to as the Vicksburg Industrial Lead, South Redwood Branch, or Redwood Branch. Most recently, the Line was owned by the Kansas City Southern Railway Company ("KCSR"); however, it entered into a lease agreement with Vicksburg Southern Railroad, Inc. ("VSOR") (collectively "Railroad"), which provided common carrier services.

### B. The Conveyance to the Railroad: the Pace and Barnes Deeds

The earliest of the Railroad's predecessors-in-interest was Vicksburg, Pensacola, and Ship Island Railroad Company ("Vicksburg"), which was created by the Mississippi

legislature. In 1871, the Mississippi legislature authorized Vicksburg "to take and receive by grant ... and to own and possess any real and personal estate that may be devised or given to it ... that may be necessary and convenient for the construction, maintenance, and management of said railroad." Segments of the Railroad right-of-way were acquired through various means, most importantly for this discussion, deeds of Louisa Barnes ("Barnes deed") and Elijah and Rosana Pace ("Pace deed").[4]

Eight Plaintiffs acquired their properties from the Barnes deed: Buford; Ford; R. Hatchett; H. Hatchett; Hill; C. Parker; and Mobley. A road, which was dedicated by plat, separates seven of the eight Plaintiffs' properties from the railroad right-of-way.[5] In addition, four Plaintiffs, Parker, Pfannenstiel, The Sanders Family Trust, and Charles Upshire, acquired their property from the Pace deed.

The operative language of the Barnes and Pace deeds is identical. The Barnes and Pace deeds include three grants in two different sentences. In relevant part, the first sentence includes two grants of rights and privileges to the Railroad:

> ... **the right and privilege to build and construct the said Railroad, with all its works, bed, ties, iron, embankments, and excavations, in and upon following described and mentioned tracts, pieces and parcels of land, lying and being in the County of Warren, State of Mississippi,** to wit: [description by section, township, and range, along with acreage contained therein] and also **the right and privilege**

---

1. The facts contained herein are taken from the parties' Proposed Statements of Uncontroverted Facts.

2. A portion of the railroad right-of-way was acquired by the construction and subsequent use of the right-of-way without color of title. In Mississippi, when a railroad uses property for its railroad without having condemned the property or without voluntary grant for more than 10 years, it acquires an easement. *Ryan v. Mississippi Valley and Ship Island Railroad Co.,* 62 Miss. 162, 1884 WL 3438, *2–3 (Miss.1884).

3. Defendant concedes that those Plaintiffs who own property abutting the adverse possession

(*i.e.,* prescriptive easement) segments of the recreational trail have demonstrated ownership of fee in the right-of-way. *See* DKT # 37, at 2, 12 n. 4, 14 n. 5, and DKT # 38, at para. 18.

4. In addition, the Railroad right-of-way was conveyed by deeds from the Vicksburg Realty Company, dated September 14, 1916, and from Jim Gaines and Lizzie Gaines, dated September 28, 1916.

5. The properties owned by these Plaintiffs, and the road, were dedicated by plat in 1906: Henderson; Ford; R. Hatchett; H. Hatchett; Hill; C. Parker; and Mobley.

forever hereafter to use, enjoy, manage and employ, control and direct the use of said Railroad works, beds, ties, iron, embankments, and excavations on said land and premises aforesaid free from any let, hindrance or obstruction.

The second granting sentence includes a habendum clause, describing a "strip of land ... One Hundred feet wide" ... to have and to hold the same in fee simple, unto the said party of the second part, according to the terms and conditions of said Charter aforesaid.

## C. Purpose for Terminating Rail Service

The City wanted rail service terminated because it wanted to develop the land alongside the Line for use by a gambling casino. According to the City, a recreational trail would harmonize with the casino's development plans. On August 24, 2007, the Railroads jointly filed their respective petitions under 49 U.S.C. § 10502 for exemption from the provisions of 49 U.S.C. § 10903. Through those petitions, KCSR sought to abandon 4.25 miles of rail line that extended from Milepost 225.6 to Milepost 229.85. Specifically, the Railroad claimed that "[t]he purpose of the abandonment [was] to (1) eliminate an underused railroad facility and tracks, (2) facilitate local land use and development plans that cannot proceed without the requested abandonment, and (3) preserve the right-of-way for trail use purposes." [6] Thereafter, KCSR entered into a three-way, one-million-dollar transaction, to transfer ownership of the Line. The Casino would receive 104 acres and the City would receive 52 acres for conversion of the right-of-way into a recreational trail.

## D. The Railroad's Abandonment Process

On September 26, 2007, the City filed a request for issuance of a NITU covering the Line with the STB. This authorized the City to negotiate with KCSR during a 180–day period for railbanking and interim trail use. Thereafter, KCSR agreed to negotiate with the City.

On June 16, 2008, the STB issued a NITU authorizing interim trail use and railbanking. On September 5, 2008, KCSR and the City notified the STB that the parties had entered into a Trail Use Agreement for the conversion of the Line to a recreational trail. Under the terms of the Trail Use Agreement, the City agreed that if the reactivation of rail services on the line were deemed necessary or desirable, it would transfer the Line, as required by the Trails Act and the STB.

In this case, Plaintiffs contend they have a reversionary interest in the Railroad right-of-way. Specifically, they argue that their revisionary interest was taken when the STB issued the NITU authorizing the conversion of the right-of-way to a public trail.

## III. *Standard of Review*

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1). When considering a motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter," but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. *Id.* at 248, 106 S.Ct. 2505.

The moving party bears the initial burden of establishing the absence of any material fact, and any doubt over factual issues will be resolved in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Once this burden is met, the burden shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. When the parties have cross-moved for summary judgment, the court reviews the motions under the same exact standards. *First Annapolis Bancorp., Inc. v. United States*,

6. Plaintiffs' Findings of Fact at 4.

75 Fed.Cl. 263, 275 (2007). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). "Rather, the court must evaluate each party's motion on its own merits, draw[ing] all reasonable inferences against the party whose motion is under consideration." *Id.*

### IV. *Discussion*

The Court will analyze Plaintiffs' Fifth Amendment takings claim according to the analytical framework established by the Federal Circuit in *Preseault v. United States* 100 F.3d 1525 (Fed.Cir.1996) ("*Preseault II* "). Therefore, in order to determine whether Plaintiffs have a valid takings claim, the Court must determine: 1) who owned the strips of land involved, specifically, whether the railroad acquired only an easement or obtained a fee simple estate, and 2) if the Railroad acquired only an easement, were the terms of the easement limited to the use of railroad activities or did they include future uses as public recreational trails. *Id.* The Court addresses each issue in turn.

### A. Nature of the Railroad's Interest

The Court must determine, under Mississippi law, who has standing and whether the Railroad acquired an easement or fee simple interest in the subject right-of-way.

### 1. *Ownership of Land*

 In order assert a takings claim, Plaintiffs bear the burden of proving that they owned the property allegedly taken. *Air Pegasus D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed.Cir.2005). Under Mississippi law, the owner of a fee simple interest in land abutting an easement owns fee simple interest to the center of the easement. *New Orleans & Northeastern R.R. v. Morri-*

*son*, 203 Miss. 791, 35 So.2d 68, 71 (1948) (conveyances carry title in fee to the center line of the easement as to subsurface minerals and reversionary rights to the surface). Throughout, the Parties refer to this as the "center line rule." Owners who obtained their interests in abutting parcels by adverse possession acquired fee to the center line of the railroad right-of-way. *Jones v. New Orleans & Northeastern Railroad Co.*, 214 Miss. 804, 59 So.2d 541, 545 (1952). The rationale behind the center line rule is that:

> [T]he intent to convey to the middle line . . . arises from the presumption that the adjoining owners originally furnished the land for a right of way in equal proportions; and from the further presumption that such owner, in selling land bounded upon the highway, intended to sell to the center line of the street, and not to retain a narrow strip which could hardly be of use or value except to the owner of the adjoining land.

*Id.* at 545 (applying the center line rule to railroad easements).

In this case, as a threshold matter, there is a dispute between the Plaintiffs and Defendant whether certain landowners abut the Railroad right-of-way. Plaintiffs argue that all 15 landowners abut segments of the right-of-way, which the Railroad acquired through two deeds and by adverse possession.[7] Nevertheless, the Government contends that seven Plaintiffs,[8] who acquired their property from the Barnes deed, do not have standing because a street runs between their lots and the Railroad right-of-way.

Plaintiffs rely on two cases to establish that the intervening road is an easement and does not cut off the seven landowners' property interest. It is clear that the center line rule applies under Mississippi law. In *Panhandle Oil Co. v. Trigg*, the Mississippi Supreme Court explained that the purchaser of a platted lot owns fee title to the center line of an abutting street. *Panhandle Oil Co. v. Trigg*, 148 Miss. 306, 114 So. 625 (1927). Specifically, the *Panhandle* court held that

---

7. The United States does not dispute that under Mississippi law, the Railroad held an easement in the right-of-way that was acquired by adverse possession.

8. Plaintiffs Henderson; Ford; R. Hatchett; H. Hatchett; Hill; Parker; and Mobley.

"[w]hen the appellee platted the land into lots and blocks, with streets and alleys shown thereon, and sold lots with reference to this plat, this was a dedication of the streets to the public use; and when he sold lots with reference to this plat, the purchasers acquired the fee of the abutting streets to the center thereof." *Id.* at 626.

Plaintiffs further rely on an Indiana case analogous to theirs. In *Lake County Trust Co. v. Lane*, the Montgomerys (represented by the Lake County Trust Company as Trustee) claimed to be abutting property owners of a railroad right-of-way although there was a road on their property. 478 N.E.2d 684, 686 (Ind.Ct.App.1985). The County was added as a defendant due to the fact it established the road. *Id.* The trial court held that the County was the abutting landowner by virtue of its road and that the Montgomerys had no claim. *Id.* at 687. The Appeals Court reversed, noting that in the absence of the road, the Montgomerys' parcel would abut the railroad right-of-way. *Id.* at 688. Since the court found that the road was only an easement, the court held that "the Montgomerys are the adjacent and adjoining *landowners* to the east of the abandoned railroad right-of-way." *Id.* (italics in original).

With the facts before us, Plaintiffs argue that the street is not an intervening parcel under the *Panhandle* decision. Specifically, Plaintiffs advance the argument that the street is an additional easement over their land. The road was not platted until 1906; therefore, Plaintiffs argue that Barnes owned a fee interest in the land that ultimately had a road built over it. Therefore, Plaintiffs contend that the seven landowners own the fee under the road, establishing that they abut the Railroad right-of-way. Plaintiffs assert that to hold otherwise would mean that the fee interest in the Railroad right-of-way evaporated when the additional road was established. As such, they argue that they own the fee interest under the road, through to the center of the Railroad easement. Furthermore, Plaintiffs argue that as in *Lake County Trust* in the absence of the road easement, the parcel would abut the railroad right-of-way.

The Government argues that if Plaintiffs do not own fee title to the land underlying the entire street, they do not abut the Railroad right-of-way. While the Defendant does not dispute that under Mississippi law a road dedicated by plat is an easement, the Government contends that Mississippi authority does not support Plaintiffs' argument that they took fee title to the land underlying the entire street. Simply, the Defendant argues that, in this case, the center line rule only applies to the intervening road easement, not the Railroad right-of-way. In addition, Defendant argues that *Lake County Trust* is misplaced because Plaintiffs cannot claim to hold fee title to more than Mississippi law gives them. Specifically, the Government focuses on the *Preseault* decision, which requires the Court to apply Mississippi property law. For these reasons, the Government argues that the seven Plaintiffs do not abut the Railroad right-of-way.

■ Proof of ownership in land abutting a railroad easement is an essential element in a Fifth Amendment takings claim. To resolve the dispute, the question to focus upon is what rights did the grantor have when conveying the easement to the Railroad? Simply, the Court must determine whether the center line rule applies to the road easement or the Railroad right-of-way. Here, on the day the Railroad acquired the easement, Barnes retained a fee interest in the land abutting the Railroad right-of-way, to its center line under Mississippi law. Consequently, her successors-in-interest, the seven Plaintiffs, obtained that same exact interest. Most logically, the later presence of the road easement did not make the initial fee interest of the grantor to the railroad right-of-way vanish. The *Panhandle* decision stands for the proposition that the creation of the road, dedicated by plat, merely burdened the seven Plaintiffs' land with another easement. Therefore, the center line rule must be read to only apply to the original easement that abutted the grantor's land. It would be a different story if there was a fee interest between the Railroad right-of-way and Plaintiffs' property; however, there is an easement. The road easement cannot cut off the Plaintiffs' fee rights. It is clear to the Court

that the Plaintiffs have met their burden in establishing that the seven Plaintiffs abut the Railroad right-of-way; therefore, all 15 Plaintiffs have standing.

It also seems clear to the Court that the center line rule, developed for platted roads was designed to apply to a road separating two separately owned pieces of property. Each piece gets half of the property under the road. When one owner owns all property on either side of the road then all the land under the easement is held by that owner and the center line rule is irrelevant to that situation. Here the rule would not apply to the facts in this case. From the logic of the Mississippi cases, it is almost certain that the Mississippi courts would follow the same logic as *Lake County Trust. See Lake Cnty. Trust Co. v. Lane*, 478 N.E.2d 684 (Ind.Ct. App.1985).

### 2. Nature of the Conveyance

Ultimately, whether all 15 Plaintiffs have a property interest in the land underlying the Railroad right-of-way depends upon the nature of the original conveyance.[9] *Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373–74 (Fed.Cir.2009).

The two deeds at issue, the Barnes and Pace deeds, contain identical language relevant to the takings legal analysis. The relevant language of these deeds is as follows:

Consideration: $1 and "the benefit, advantage, and the accrued value of the lands through which said Railroad Company may run and construct the said Railroad."

Grant: "grant, bargain and sell, unto the [railroad] and by virtue of the Charter incorporating said Railroad Company, entitled, An Act to incorporate the Vicksburg Pensacola and Ship Island Railroad Company, which said Act and Charter became a law on the 21st day of March, AD 1871, the right and privilege to build and construct the said Railroad, with all its works, beds, ties, ——, embankments, and excavations, in and upon the following described and mentioned tracts, pieces and parcels of land ..." [and also the] "right and privi-

lege forever hereafter to use, enjoy, manage and employ, control and direct the use of said Railroad works, beds, ties, iron, embankments, and excavations on said land and premises aforesaid free from any let, hindrance or obstruction ..." "And for and in consideration of the premises, the party of the first part, grants, bargains and sells unto the party of the said party of the second part, all that certain tract, piece or parcel of land, upon and a part of the land and premises hereinbefore described, to wit: a strip of land One Hundred feet wide, running through said land and premises, according to the survey and plat of said Railroad."

Habendum: "To have and to hold the same in fee simple unto the said party of the second part according to the terms and conditions of said Charter aforesaid."

■ Many Mississippi land cases have resolved interpretation issues by looking to rules of construction. In Mississippi, a deed granting a "right" rather than "land" conveys an easement. *Alabama & Vicksburg Railway Co. v. Mashburn*, 235 Miss. 346, 109 So.2d 533, 536 (1959). In *Crum v. Butler*, the Mississippi court stated that, "[i]nstruments that specifically refer to a strip, parcel, or tract of land have been held to convey a fee." *Crum v. Butler*, 601 So.2d 834, 838 (Miss.1992) (citing *Ala. & Vicksburg Ry. Co. v. Mashburn*, 235 Miss. 346, 109 So.2d 533 (1959)). The granting clause in *Crum* conveyed a "Right of Way, a strip of land." *Id.* at 837–39. The court found that the deed conveyed an easement, relying primarily upon the rule of construction that "[w]here the terms of a contract are vague or ambiguous, they are always construed most strongly against the party who drew it." *Id.* at 839; *see also Valley Realty Co. v. United States*, 96 Fed.Cl. 16 (2010) (explaining that under the doctrine of contra proferentem ambiguity should be resolved against the party who drafted the contract).

On the other hand, in *Mashburn*, the Mississippi Supreme Court held that the deed at

---

9. Defendants admit that the areas of the right-of-way obtained by the Railroad through adverse

possession were easements.

issue conveyed fee title to a railroad. 109 So.2d at 537. The deed in *Mashburn* "released, relinquished, and sold" to the railroad and its "successors forever, all that portion of our tract of land ... which is or may be necessary or useful to the said Company in the construction, use, and preservation of the Rail Road ..." *Id.* at 534. The court held the railroad acquired property, in fee simple, and the deed conveyed "land". *Id.* (rejecting the argument that only an easement had been conveyed because of the deed's phrase, "which is or may be necessary or useful to the said [c]ompany in the construction, use, and preservation of the Rail Road."). Additionally, in *Mississippi Central Railroad Co. v. Ratcliff,* the Mississippi Supreme Court construed a deed in which the grantor conveyed to a railroad "seven pieces or parcels of land ..." 214 Miss. 674, 59 So.2d 311, 312 (1952). For each parcel of the Ratcliff deed, there was a metes and bounds description, followed by the language, "[t]he above described tract or right of way ..." *Id.* at 312–13. Further, the metes and bounds description of some of the parcels included the language, "a strip of land 100 feet wide, fifty feet either side of the present located center line ..." *Id.* at 312. Thus, the *Ratcliff* court rejected the argument that that the reference to a "right of way" in the recital clause defeated the conveyance of a fee simple estate. *Id.* at 312.

If the Railroad "obtained fee simple title to the land over which it was to operate ... [there is] no claim related to those parcels for a taking." *Preseault II* at 1533. Therefore, the Plaintiffs' primary argument is that the Pace and Barnes deeds enumerated rights granted to the Railroad in the granting clause. Plaintiffs contend that in both the Barnes and Pace deed, the first two granting clauses conveyed an easement. Specifically, the Plaintiffs rely on the fact the deed conveyed a mere "right and privilege to build and construct the said Railroad" and the "mere right and privilege forever hereafter to use, enjoy, manage and employ, control and direct the use of said Railroad ..."

Conversely, the Government claims that the Railroad obtained a fee simple interest, thereby invalidating Plaintiffs' takings claim.

The Government argues that, as in *Mashburn* and *Ratcliff,* the Barnes and Pace deeds conveyed land, not an easement. The Government emphasizes the fact that the granting clause was followed by a habendum clause. Specifically, the habendum clause reads, "and also: to have and to hold the same in fee simple, unto the said party ..." Consequently, the Government argues that since the habendum clause immediately follows the conveyance of "a strip of land" rather than the conveyance of a "right or privilege," to hold that land that the Railroad only received an easement would be contrary to the intent of the parties.

■ The Barnes and Pace deeds contain language that could indicate either an easement or a fee simple interest. Therefore, the Court holds, as did the court in *Crum,* that if the terms of a contract are ambiguous, the Court will construe it against the party who drafted it. Here, the Barnes and Pace deeds are identical; therefore, it is almost certain that the Railroad prepared them. In construing the third granting clause, the habendum, we will look to the Mississippi rules of construction, as suggested by the Plaintiff, that "where there are two repugnant clauses, the first must prevail." *Pursue Energy Corporation v. Perkins,* 558 So.2d 349, 353 (Miss.1990). As a result, since the first two granting clauses conveyed rights, easements, it should prevail over the last granting clause that purported to convey land, a fee simple interest. Thus, the Court holds that the Barnes and Pace deeds conveyed easements to the Railroad, not "land."

### B. Scope of the Easement

■ The next question to be answered is whether the easements granted to the Railroad by deeds and adverse possession were "limited to use for railroad purposes." *Preseault II* at 1533. The Court's inquiry is governed by Mississippi law, because the right-of-way is in Mississippi and was acquired from Mississippi private landowners. *See, e.g., Id.* at 1541 (looking to Vermont law to determine scope of railroad easement in Vermont). The Government submits that this is a matter of first impression, whether railbanking and interim trail use would be

within the scope of the Railroad's easement, under Mississippi law. However, the Mississippi cases give us some guidance. The Court concludes that Mississippi courts would not find that railbanking and interim trail use are within the scope of the Railroad's easement.

Plaintiffs argue that the Pace and Barnes deeds established an easement and the rights conveyed were specific and limited to railroad use. In Mississippi, the powers of a railroad are created by legislative authority and include only those powers that are expressly granted in the act chartering the railroad. *Canton v. Cotton Warehouse Co.,* 84 Miss. 268, 36 So. 266, 271 (1904). The railroad that acquired the right-of-way in this case was specifically limited by the Charter to "take and possess as much more land as may be necessary for the construction, maintenance and security of said railroad" and that "may be necessary and convenient for the construction, maintenance, and management of said railroad." The Barnes and Pace deeds specifically refer to the same exact terms and conditions as the Railroad's Charter.

Furthermore, Mississippi law limits railroad purpose easements to uses that are "essential or incidental to its full and complete use for the purpose for which it was acquired" and prohibits making use of the easement in a manner foreign to the railroad. *See City of Hattiesburg,* 42 So.2d at 719; *City of Canton v. Canton Cotton Warehouse Co.,* 84 Miss. 268, 36 So. 266, 271 (1904); *Weir v. Standard Oil Co.,* 136 Miss. 205, 101 So. 290, 291 (1924). The Plaintiffs asserts that since Mississippi law limits use of railroad property to purposes that facilitate its business and prohibits uses that are foreign to the railroad, Mississippi courts would not allow trail use.

In contrast, the Government relies on *Weir v. Standard Oil Co.,* 136 Miss. 205, 101 So. 290 (1924), where a railroad leased a portion of its depot grounds, in which it held an easement, to Standard Oil for off-loading oil from the rail tanker cars. The owners of the underlying fee sued to recover the land occupied by Standard Oil. *Id.* at 290–91. The Mississippi Supreme Court found that Stan-

dard Oil's use of the railroad easement for storing and handling oil was within the easement's scope. *Id.* Moreover, the Mississippi Supreme Court in *Jones v. City of Hattiesburg,* cited *Weir* for "the principle ... that a railroad company may use its right of way not merely for its track but for any other building or structure which reasonably tends to facilitate its business." *Jones v. City of Hattiesburg,* 207 Miss. 491, 42 So.2d 717, 719 (1949). In *City of Hattiesburg,* the railroad sought to erect a warehouse, and the court noted that "[t]he construction and operation of a warehouse cannot be any more objectionable than the vibration of trains with their attendant noise, vibration, smoke, and dirt, or the switching and placing of railroad cars upon the property." *Id.*

Nevertheless, as explained in *United States v. Harrison County,* "an easement defines its powers and boundary which may not be changed, unless authorized by the instrument under which it was acquired or by agreement of the parties." *U.S. v. Harrison County,* 265 F.Supp. 76, 84 (S.D.Miss.1967). In Mississippi, the scope of a prescriptive easement is defined by the adverse use exercised during the period of prescription. *West Point v. Womack,* 178 Miss. 808, 174 So. 241, 242 (1937).

While the Government relies on *Weir* to establish that under Mississippi law, a railroad may convey an interest in a third party, the lease in *Weir* facilitated the railroad's business, not a third party's business. Here, the Railroad entered into a three-way transaction to transfer 156 acres of ownership of the Line to the Casino and the City for conversion into a trail. It is important to note that the City wanted to terminate rail service because it not only wanted to develop the land for trail use, but also for a new gambling casino. The Government's argument is unpersuasive because the cases which it cites concern uses that relate to the Railroad's ongoing railroad services. Here, the NITU discontinued active rail service and created trail use and enabled casino use. Simply, these actions are not railroad purposes under Mississippi law. Here, the Railroad's use would certainly not be consistent

 

with a trail use. In fact, it would be highly inconsistent. *See* facts in *Erie R.R. Co. v. Tompkins,* 302 U.S. 671, 58 S.Ct. 50, 82 L.Ed. 518 (1937).

Furthermore, in *Preseault II,* the Government unsuccessfully argued that both recreational trail use and railbanking were railroad purposes within the scope of the easement under Vermont law. *Preseault II* at 1533. The Federal Circuit rejected the argument and held that there was no support for the proposition "that the scope of an easement limited to railroad purposes should be read to include public recreational hiking and biking trails." *Id.* at 1530. In addition, the Federal Circuit in *Toews v. United States* further recognized that recreational activities are very different from railroad purposes. 376 F.3d 1371 (Fed.Cir. 2004). Specifically, the court noted:

> It appears beyond cavil that use of these easements for a recreational trail—for walking, hiking, biking, picnicking, Frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway—is not the same use made by a railroad, involving tracks, depots, and the running of trains.

*Id.* at 1376.

The Federal Circuit has not accepted the Government's argument that public recreational use by a non-railroad is within the scope of an easement limited to railroad purposes. Therefore, a public recreational trail is outside the scope of the easement when an original deed to the railroad grants an easement for railroad purposes. Since the easements granted by the Pace and Barnes deeds were limited to railroad purposes, Plaintiffs have established this element of Defendant's liability pursuant to the Federal Circuit's test as set forth in *Preseault II.* In regards to the scope of the prescriptive easement, Plaintiffs have established that until it transferred the easement to a third party for use by the public as a hiking and biking trail, the railroad used the property for the construction and operation of a railroad.

Accordingly, Plaintiffs, have established that the Railroad acquired easements limited to railroad purposes across those sections of the right-of-way. Because the easements were limited to use for railroad purposes, the issuance of the NITU, authorizing conversion of the Line for use as a recreational trail under the Trails Act, is beyond the original scope of the easement. Therefore, the Government's action constitutes a taking that entitles Plaintiffs to just compensation.

## V. *Conclusion*

For the reasons set forth in this opinion, Plaintiffs' Motion for Summary Judgment is **GRANTED,** and the Government's Cross–Motion is **DENIED.**

**It is so ORDERED.**